# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ARLINA ROBINSON, *et al.*,

    Plaintiffs,

v.                                                 Civil Action No. 8:19-cv-01025-PX

DAVID PYTLEWSI, *et al.*

    Defendants.

## MEMORANDUM OPINION

Pending before the Court are two motions to dismiss, one filed by Defendants Dr. Howard Pinn and the State of Maryland on behalf of the State Department of Corrections ("DOC") and the other filed by Defendants MHM Services, Inc. and Dr. David Pytlewski. ECF Nos. 16, 26. The motions are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the reasons discussed below, both motions are granted in part and denied in part.

**I.    Background[1]**

This case centers on the tragic death of James Robinson who committed suicide while an inmate with the Maryland Department of Corrections. Robinson was diagnosed with bipolar disorder in 2007, and since that time was prescribed psychotropic medication to treat his severe symptoms. ECF No. 8 ¶ 16. Robinson had previously attempted to commit suicide on several occasions, including during prior terms of incarceration while in the custody of DOC. *Id.*

On October 2, 2015, Robinson received a sentence of one year and one day imprisonment to be served in DOC custody. *Id.* ¶ 14. While Robinson was pending designation, he was on suicide watch at the Howard County Detention Center. *Id.* ¶¶ 13–14.

---

[1] The Court accepts the facts pleaded in the Complaint as true and construes them most favorably to Plaintiffs. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

On October 5, 2015, Robinson was transferred into DOC custody, and was specifically placed at Jessup Correctional Institution ("JCI") to begin serving his sentence. *Id.* ¶ 15. DOC records document Robinson's longstanding medical and psychiatric conditions—including prior suicide attempts—in his DOC medical and base files, and thus DOC and related personnel knew of Robinson's severe mental health condition. *Id.* ¶ 16.

Upon his arrival at JCI, Robinson was evaluated and diagnosed with psychotic disorder, schizoaffective disorder, and personality disorder; he was also "placed under close observation for self-injurious behavior." *Id.* ¶¶ 15, 17. As of October 25, 2015, progress notes in Robinson's medical file reflect that Robinson was complaining of suicidal ideations and was not taking his prescribed medication. *Id.* ¶ 18.

On recommendation from the staff psychiatrist at JCI, Robinson was transferred to the Patuxent Institution to receive additional psychiatric care. *Id.* ¶¶ 18–19. On January 8, 2016 Patuxent staff found Robinson alive but with a bedsheet around his neck in an apparent suicide attempt. *Id.* ¶ 20. In response, Patuxent Medical staff ordered Robinson to be placed in "administrative segregation," or suicide watch, to address the risk of Robinson's future self-harm. *Id.*

On February 2, 2016, Robinson was transferred to the Eastern Correctional Facility ("ECI"). *Id.* ¶ 21. Upon his arrival at ECI, Robinson did not receive a formal suicide screening as is required by the Maryland Department of Public Safety and Correctional Services ("DPSCS") policy. Nor did any medical staff examine Robinson for the next seven days. *Id.* ¶¶ 22–24. On February 9, 2016, Dr. Pinn, a medical doctor employed by the State of Maryland, recommended that Robinson be placed among the general population as long as DOC staff monitored Robinson's medications, even though Dr. Pinn knew of Robinson's lengthy history of

suicide attempts. *Id.* ¶ 24.

The next day, Dr. Pytlewski conducted a psychiatric evaluation of Robinson during which Pytlewski learned of Robinson's history of suicide attempts and serious mental illness. *Id.* ¶ 25. Medical care at ECI is provided in part through a private corporation, MHM. Dr. Pytlewski is a medical doctor employed by MHM. *Id.* ¶¶ 3, 5. Robinson reported to Dr. Pytlewski at that time that he was taking his medication, that his hallucinations and disorganized thinking were minimal, and that he had no suicide plan or other suicidal ideation. *Id.* Dr. Pytlewski diagnosed Robinson with schizoaffective disorder, renewed his prescribed medication, and recommended a follow-up visit in 12 weeks. *Id.* Dr. Pytlewski did not take steps to verify or monitor Robinson's medication levels, and again in contravention of DPSCS Policy, did not complete a suicide screening or the mandatory suicide screening form. *Id.* ¶¶ 25–26.

Over the next few days, Robinson visited ECI's medical department several times complaining of chest pains. *Id.* ¶ 27. Each time he "appeared to the medical staff as disorganized, speaking tangentially, inappropriate, and very unclear." *Id.* The medical staff, concerned about Robinson's mental health, contacted Defendant Dr. Pinn and "asked him to intervene." *Id.*

Dr. Pinn consulted with Dr. Pytlewski and neither doctor examined Robinson. *Id.* ¶¶ 27–28. The two doctors agreed that Robinson likely had "intellectual deficits" that contributed to his erratic behavior, but that Robinson would remain psychologically stable if he took his medication. *Id.* ¶ 28. The doctors told the medical staff that Robinson should be "more closely guarded" on his visits to medical. *Id.*

On February 18, 2016, Dr. Pinn met with Robinson about the previous week's visits to the medical department. *Id.* ¶ 30. Dr. Pinn personally observed at this visit that Robinson

3

"remained difficult to focus and very scattered." *Id.* When Robinson reported that he found it difficult to wake up for his medication, Dr. Pinn noted that Robinson's "lack of full medication maybe [sic] contributing to his very scattered, poorly focused and odd behavior." *Id.* Thereafter, aside from one visit to the medical department for more chest pain, Robinson had no contact with ECI medical staff until March 7, 2016. *Id.* ¶ 31.

On March 7, Robinson told medical staff that he felt "like taking a sheet and trying it around my neck and hanging it up" and that he had trouble waking up to take his medication. *Id.* ¶ 32. Drs. Pytlewski and Pinn were additionally aware that Robinson's long-term relationship with the mother of his children was likely coming to an end. *Id.* ¶¶ 32–33. In response, Dr. Pytlewski placed Robinson on administrative segregation, or suicide watch. *Id.* ¶¶ 32.

On March 8, Drs. Pytlewski and Pinn examined Robinson together. Both doctors observed that Robinson was "moderately/severely depressed,"—Robinson spent the examination lying on the floor in a "suicide blanket." *Id.* ¶ 34 & n.1. Robinson also admitted to the doctors that he was not taking his medications. *Id.* ¶ 34. Dr. Pytlewski ordered that Robinson remain on "Level 1 administrative segregation observation," and that he continue with his medication. *Id.* Based on information in Robinson's prison records, the doctors knew that Robinson had been cited for committing a "lewd act" which had the potential of extending Robinson's prison term by two months. *Id.* ¶¶ 35, 49.

The next day, March 9, Drs. Pytlewski and Pinn met with Robinson again. Robinson refused to speak to them and instead "la[id] on the floor of his cell wrapped in a suicide blanket." *Id.* ¶ 35. The doctors met with Robinson again the next day and noted "that [Robinson] had been compliant with his medication and that he denied suicidal ideations." *Id.* ¶ 37.[2] Based on this

---

[2] The Complaint and incorporated documents do not reveal why the doctors concluded that Robinson was medication compliant. *See* ECF No. 8 ¶ 37–38.

4

encounter with a very ill Robinson—and despite his inability to communicate, his physical immobilization, and his previous medication noncompliance—the doctors cleared Robinson for transfer, within 24 hours, to a less restrictive housing tier. *Id.* ¶¶ 36–37.

The doctors conditioned Robinson's transfer on his being "double celled" so that another prisoner could alert staff if he attempted suicide and on his "compliance with his prescribed medication." *Id.* ¶ 37. If Robinson "was not compliant with his medication, medical staff was to be informed immediately." *Id.*

The doctors took no steps to ensure that these directives were communicated to prison staff. ECF No. 8 ¶¶ 40–41. Nor did Drs. Pytlewski and Pinn perform a suicide assessment on Robinson prior to transfer out of administrative segregation. The doctors also did not restrict Robinson's access to bed linens despite Robinson's prior attempt at Patuxent to kill himself using bedsheets and his more recent reference to tying a sheet around his neck and "hanging it up." *Id.* ¶¶ 39–40.

As it turns out, and contrary to the doctors' belief, Robinson had not taken his medication on March 10, and refused his medication in the days that followed. *Id.* ¶¶ 44–48. On March 12, Robinson also lost his cellmate. *Id.* ¶ 46. Yet, even though Robinson was now alone in his cell, unmedicated, and under no special observation, no staff, including Drs. Pytlewski and Pinn, did anything to assess Robinson's continued safety. *See id.* ¶¶ 43, 49.

Then, on the evening of March 14, 2016, Robinson was found unresponsive, sitting on his cell bunk with his sheet tied around his neck and secured to the bedframe. *Id.* ¶ 50. Robinson was pronounced dead at 11:19 p.m. *Id.* He was 33 years old. *Id.* ¶ 13.

The DOC conducted an internal investigation following Robinson's death. Drs. Pinn and Pytlewski represented to the investigators that Pinn had in his possession a "close observation

form" that documented the doctors' March 10 release orders for Robinson. *Id.* ¶ 53. However, ECI staff reported never having received such orders. The form itself also did *not* direct DOC staff to ensure that Robinson is housed with another inmate at all times. *Id.*; ECF No. 8-1 at 10.

The investigation ultimately concluded that Dr. Pinn's statements regarding the close observation form were "patently false." ECF No. 8 ¶¶ 52–53. Dr. Pinn eventually conceded that he never memorialized his orders, and instead blamed his faulty memory for the misrepresentation. *Id.* ¶¶ 51, 53. Ultimately, Dr. Pinn adopted the position that Dr. Pytlewski verbally advised ECI correctional staff of the need to "double cell" Robinson. *Id.*

On February 6, 2019, Plaintiffs Arlinda Robinson (James Robinson's mother) and Diana Calderon (the mother of Robinson's two minor children) filed in Prince George's County Circuit Court a wrongful death and survivorship action against Dr. Pinn, Dr. Pytlewski, the State of Maryland, and MHM. ECF No. 1 at 2; ECF No. 8 ¶¶ 1–2. Plaintiffs also allege that defendants were "deliberately indifferent" to Robinson's "serious medical needs" in violation of Eighth Amendment to the United States Constitution as made applicable to the state through the Fourteenth Amendment, as well as Articles 16 and 25 of the Maryland Declaration of Rights. ECF No. 8 ¶¶ 61–90. The Complaint incorporates the certificate of expert psychiatrist, Neil Blumberg, M.D, who concluded after review of the pertinent records that (1) Robinson was at a high risk of suicide at the time of his death (2) Drs. Pytlewski and Pinn's failure to perform a formal suicide risk assessment or document their orders following Robinson's release from administrative segregation fell below the applicable standard of care and (3) had Defendants placed Robinson back in administrative segregation on suicide watch and ensured medication administration, the risk of suicide would have been "significantly reduced." ECF No. 8-3 at 5.

On April 4, 2019, Defendants noted removal to this Court. ECF No. 1. Defendants Pinn

and the state of Maryland (collectively, "the State Defendants") moved to dismiss Plaintiffs' Complaint. ECF No. 16. Defendants Pytlewski and MHM (collectively "the Private Defendants") also moved to dismiss, incorporating the lion's share of the State Defendants' arguments for dismissal. ECF No. 26.

## II. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences most favorably to the plaintiff. *See Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). A complaint's factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). In other words, there must be sufficient allegations to render the plaintiff's claims facially plausible, or to permit reasonable inference that the defendant is liable for the alleged misconduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

## III. Analysis

The Defendants take aim at each of the counts in the Complaint. As to Robinson's constitutional claims, the Defendants contend that Robinson fails to allege plausibly that Defendants acted with deliberate indifference, and that suit is foreclosed by the doctrine of qualified immunity. On Robinson's negligence and wrongful death claims, all Defendants maintain that Robinson has not plausibly alleged a breach of the standard of care, or that they in fact caused Robinson's death. The State Defendants also raise that sovereign immunity precludes suit as to Dr. Pinn. Finally, Defendants move to dismiss Plaintiffs' separately enumerated respondeat superior count because this theory of liability cannot constitute an

7

independent cause of action.

The Court examines each of Defendants' arguments in turn.

### A. Constitutional Claims

The Complaint avers that Defendants subjected Robinson to cruel and unusual punishment in violation of Eighth Amendment to the United States Constitution and its state constitutional analogues because they knew of his high risk for suicide and denied him objectively necessary medical care with deliberate indifference. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. Mckinney*, 509 U.S. 25, 31 (1993). These protections reflect the basic tenant that, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being." *DeShaney v. Winnebago Cty. Dep't of Soc. Srvs.*, 489 U.S. 189, 200 (1989). It is therefore settled law that when "a prison official demonstrates 'deliberate indifference' to an inmate's serious medical needs, a constitutional violation occurs under the Eighth Amendment." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016) and *Estelle v. Gamble*, 429 U.S. 97, 101–06 (1976).

"[D]eliberate indifference entails something more than mere negligence" but also "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *King v. Rubenstein*, 825 F.3d 206, 219 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)); *Cosner v. Dodt*, 526 F. App'x 252, 254 (4th Cir. 2013). In other words, "deliberate indifference" means that the official "knowingly disregarded [a serious medical] need and the substantial risk it posed." *DePaola*, 884 F.3d at 486.

8

To demonstrate a defendant's deliberate indifference to a serious medical need, the inmate must have, objectively, been suffering from a serious medical need of which, subjectively, the prison staff were aware but failed to provide necessary care. *See Farmer,* 511 U.S. at 837 (1994). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto*, 841 F.3d at 225 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)) (internal alterations omitted). Importantly, mental illness that presents as a suicide risk is just as serious a medical need as purely physical ailments. *See DePaola*, 884 F.3d at 486; *see also Germain v. Shearin,* 531 F. App'x 392, 395–97 (4th Cir. 2013); *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001).

The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr*., 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). By contrast, simple medical negligence "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105–06; *see also Jackson,* 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

Articles 16 and 25 of The Maryland Declaration of Rights likewise prohibits cruel and unusual punishment. *Krell v. Queen Anne's Cty.*, No. JKB-18-637, 2019 WL 4888634, at *7 (D. Md. Oct. 3, 2019) (quoting *Delnegro v. State*, 198 Md. 80, 88 (1951)). "These provisions have been 'consistently construed in being *in pari materia* with their Federal counterpart[],'"—the Eighth Amendment. *Farmer v. Kavanagh*, 494 F. Supp. 2d 345, 371 (D. Md. 2007) (quoting *Evans v. State,* 396 Md. 256, 327 (2006)). Thus, any analysis as to the Eighth Amendment is equally applicable to Plaintiffs' claims under the Maryland Declaration of Rights. *See Harris v. State*, 312 Md. 225, 237 n.5 (1988).

Defendants concede that Robinson's mental illness and consequent risk of suicide constituted a serious medical need. Defendants maintain, however, that the Complaint fails to allege the Defendants acted with deliberate indifference. The Court cannot agree.

The allegations in the Complaint paint a damning picture against Defendants. When Robinson arrived at ECI, Defendants were keenly aware from his prior incarceration at DOC that Robinson had suffered with serious, longstanding mental illness and had tried to kill himself before. Defendants also knew that shortly before arriving at ECI, Robinson had been on suicide watch at Howard County and at Patuxent for psychiatric care where he tried to kill himself by tying a bedsheet around his neck. Despite knowing the severity of Robinson's current and past mental health condition, Drs. Pytlewski and Pinn did not perform any suicide assessment and failed to implement any real plan to treat Robinson's mental illness.

While at ECI, Robinson disassembled further. On his visits to medical, he made little sense. After medical staff sought Dr. Pinn's intervention, neither Pytlewski nor Pinn examined Robinson. Instead the doctors concluded that Robinson's behavior stemmed from his "intellectual deficiencies."

On March 7 Robinson expressed suicidal ideation and was placed on suicide watch, and over the course of the next two days, the doctors found Robinson immobile, not communicating, lying on the floor with a suicide blanket over him. Yet, despite Robison's recent pronouncement that he wished to tie a bed sheet around his neck and "hang it up," the doctors ordered that Robinson be taken *off* suicide watch and transferred to a regular tier.

Then, when Robinson was transferred on March 10, just days before his death, the doctors did nothing to ensure their directives regarding medication compliance and double cell housing were communicated to staff. Putting to one side the wisdom of transferring Robinson *at all,* the doctors clearly displayed a pattern of knowing, or deliberate, indifference to Robinson's safety. That Robinson resorted to self-harm under these circumstances—especially by using his bedsheets, as he had done in the past and threatened to do just days prior—should be surprising to no one, least of all Drs. Pytlewski and Pinn. When construing the pleaded facts as true and most favorably to Plaintiffs, the Complaint establishes that Pytlewski and Pinn, "knowingly disregarded" Robinson's "substantial risk" that he would commit suicide. *DePaola*, 884 F.3d at 486.

Defendants, relying on out-of-circuit authority, argue in response that Drs. Pytlewski and Pinn did not act with deliberate indifference because they provided *some* care to Robinson; thus say Defendants, the doctors did not "intentionally" disregard a risk of harm. ECF No. 16-2 at 10. But Plaintiffs need not show Defendants acted intentionally, that is, with the "very purpose of causing harm or with knowledge that harm will result." *King*, 825 F.3d at 219. Rather, where the averred facts allow the plausible inference that defendants acted recklessly, *Scinto*, 841 F.3d at 225, or with a "knowingly disregard[]" of "substantial risk" of serious harm to Robinson

11

without proper medical care, an Eighth Amendment claim may proceed. *DePaola*, 884 F.3d at 486.

Similarly, Defendants contend that dismissal is warranted because they did not know that Robinson refused his medication the day he was moved out of administrative segregation and while on the regular tier. ECF No. 16 at 11–12. Again, Defendants miss the mark. Well before Robinson was moved, Drs. Pinn and Pytlewski had repeatedly ignored clear evidence that Robinson's condition was grave—at intake, while he was on suicide watch, and immediately prior to his transfer—and gave Robinson little meaningful medical attention in response to Robinson's growing medical distress. The doctors also knew that Robinson often was not taking his medication as directed. In this respect, the doctors' ignorance of Robinson's medication non-compliance on the day he was moved is itself a symptom of their dereliction.

Defendants lastly contend that the averred facts demonstrate that Defendants "reasonably responded" to Robinson's risk. ECF No. 25 at 6. Given the pattern of inadequate responses to Robinson's progressive decompensation, the Court has no trouble concluding that the facts as pleaded demonstrate defendants' conduct was entirely unreasonable. Defendants motion as to the federal and state constitutional claims is denied.[3]

### B. Qualified Immunity

Defendants' arguments as to qualified immunity fare no better. The doctrine of qualified immunity is designed to ensure that government officials performing discretionary functions can exercise their duties "free from the specter of endless and debilitating lawsuits." *Torchinsky v.*

---

[3] Defendants interpret Plaintiffs' reference to the Fourteenth Amendment as an attempt to bring a separate substantive due process claim. ECF No. 16-2 at 12. However, it is clear from Plaintiffs' Complaint, which speaks exclusively in terms of "deliberate indifference," that Plaintiffs rely only on Eighth Amendment protections. *See* ECF No. 8 ¶¶ 79, 86. Plaintiffs, instead appear more accurately to reference the Fourteenth Amendment as the vehicle by which federal constitutional protections are made applicable to the states.

*Siwinski*, 942 F.2d 257, 260 (4th Cir. 1991). Without qualified immunity, a substantial risk exists that fear of personal liability and harassing litigation will "unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). Government officials are thus entitled to qualified immunity for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

To overcome qualified immunity, a plaintiff must demonstrate first that defendants violated a federal right, and second that the right had been "clearly established" at the time of defendant's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Whether a federal right is "clearly established" "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Anderson*, 483 U.S. at 639) (citation omitted). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate'" such that the unlawfulness of the action was apparent at the time of its occurrence. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 740 (2011) (internal quotation marks and citations omitted)); *Anderson*, 483 U.S. at 640.

Defendants argue that they are entitled to qualified immunity because Robinson has neither shown violation of his constitutional rights or, alternatively, that any such violation was clearly established. ECF No. 16-2 at 15. The Court is not persuaded. As to the first prong, the

Court has already determined that the Complaint has plausibly established a viable Eighth Amendment claim. Second, the Court easily concludes that the rights at issue were clearly established at the time Defendants' committed the constitutional transgressions. The Fourth Circuit has long held that risk of suicide is a "serious medical need," and that deliberate indifference to this need violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment. *See, e.g.*, *DePaola*, 884 F.3d at 488; *Brown*, 240 F.3d at 389. Thus, taking the facts in the Complaint as true, Defendants are not qualifiedly immune. *Reichle*, 566 U.S. at 132. The motions to dismiss the constitutional claims on immunity grounds is denied.

### C. Negligence Claims

#### 1. Sufficiency of Complaint

The Court also will not dismiss Plaintiffs' negligence counts brought as both wrongful death and survivorship claims. As to the negligence claim, the Complaint must aver facts by which this Court could plausibly infer that: (1) defendants had a duty to keep Robinson safe, (2) defendants breached that duty, (3) Robinson suffered actual injury or loss, and (4) and that the defendants breach proximately caused the harm to Robinson. *See Wash. Metro. Area Transit Auth. v. Seymour*, 387 Md. 217, 223 (2005); *see also Young v. Swiney*, 23 F. Supp. 3d 596, 613 (D. Md. 2014) (quoting *Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012). Proximate cause is established where the negligent acts or omissions are both "a cause in fact" and "a legally cognizable cause.'" *Chang-Williams v. United States*, 965 F. Supp. 2d 673, 692–93 (D. Md. 2013) (quoting *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009)).

In the medical malpractice context, a plaintiff establishes breach when he demonstrates that a healthcare provider failed to "exercise ordinary medical care and skill based upon the standard of care in the profession." *McQuitty v. Spangler*, 410 Md. 1, 18 (2009). To show

causation, a "plaintiff must establish that but for the negligence of the defendant, the injury would not have occurred." *Jacobs v. Flynn*, 131 Md. App. 342, 354 (2000).

Defendants first contend that the Complaint fails to allege sufficiently a breach of the standard of care. The Court has already found the Complaint facts are sufficient to demonstrate the doctors acted with deliberate indifference to Robinson's serious medical needs. Inherent in this determination is that both doctors breached the standard of care sufficient to also sustain a negligence claim. *Cf. Jackson,* 775 F.3d at 179; *Miltier*, 896 F.2d at 853. Even if that were not legally and logically the case, the Court need look no further than the incorporated certificate of Dr. Blumberg to ascertain facts sufficient to demonstrate a breach. ECF No. 8-3 at 8. Specifically, Dr. Blumberg opines that:

> Although [Drs. Pytlewski and Pinn] were clearly aware of Mr. Robinson's significant risk for suicide while he was in administrative segregation, they failed to identify events or factors that would increase his risk for suicide after he was released to general housing. They failed to document and communicate to their correctional staff the need to be re-evaluated and placed back on administrative segregation should he become non-compliant with medication. In addition, given his high risk for suicide, he should never have been allowed to be single celled, which would further increase his risk for successfully taking his own life. They failed to communicate to correctional staff the need for him to be double celled. The failures of both doctors were deviations from the standard of care.

*Id.*

As to causation, the sufficiency of which Defendants also challenge, Dr. Blumberg concludes that "[h]ad Mr. Robinson been transferred back to administrative segregation, placed on suicide watch and restarted on his medications, the risk for him attempting and being successful at committing suicide would have been significantly reduced." ECF No. 8-3 at 8. Thus, Defendants' deviations of care were the "direct and proximate cause" of Robinson's death. *Id.* at 3; *see also id.* at 8. Without doubt, Plaintiffs have set out a sufficient negligence claim.

## 2. Sovereign Immunity and the MTCA

The State Defendants next argue that sovereign immunity precludes suit against Dr. Pinn because he is a state employee. To be sure, the doctrine of sovereign immunity bars suit "against governmental entities absent the State's consent." *ARA Health Servs., Inc. v. Dep't of Pub. Safety & Corr. Servs.*, 344 Md. 85, 91–92 (1996) (internal citation omitted); *Magnetti v. Univ. of Md.*, 402 Md. 548, 556 (2007). This immunity extends to agents of the State. *Estate of Burris v. State*, 360 Md. 721, 736 (2000).

However, to "ensure that an individual who is injured by the tortious conduct of the State or state employees has a remedy," the Maryland legislature has enacted the Maryland Tort Claims Act ("MTCA"). *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 711 (2009). Under the MTCA, the state has waived immunity for tort suits against the State itself subject to a $400,000 damages cap and certain notice requirements. Md. Code Ann., State Gov't §§ 12-104(a)–(b), 12-106(b), 12-108(a); Md. Code Ann., Cts. & Jud. Proc., § 5-522(a)(5). Thus, in Maryland, the State is subject to suits sounding in tort.

The MTCA is less than straightforward regarding the State's vicarious liability for tortious acts committed by its agents. The State has generally "accepted vicarious liability arising the tortious conduct of State personnel." *Ford v. Balt. City Sheriff's Office*, 149 Md. App. 107, 120 (2002). However, the MTCA does *not* waive immunity as to the State when state personnel act outside the scope of their duties or with malice or gross negligence. Cts. & Jud. Proc. § 5-522(a)(4). Nor does the MTCA permit suit against the State for the actions of persons who do not qualify as "state personnel." *Estate of Burris*, 360 Md. at 737 ("Immunity from vicarious liability is waived only to the extent that the tortious conduct is committed by 'State personnel'—a defined term."); *State v. Card*, 104 Md. App. 439, 447 (1995) ("There is nothing

in the [MTCA] itself, or in its history, suggesting an intent that the State be liable for the conduct of persons other than those included within the definition of 'State personnel.'"). Thus, as to any state personnel such as Dr. Pinn, the MTCA makes plain that if he acted within the scope of his employment, and without malice or gross negligence, the State will be liable for any negligence finding, and liability will be confined to the statutory damages cap.[4]

Unlike the State itself, however, state personnel are generally immune from tort liability. *See* State Gov't, § 12-104; Cts. & Jud. Proc., § 5-522(b). In this way, the MTCA protects state employees from shouldering liability but still affords plaintiffs recovery against the State for tortious acts committed by its employees. *Marks v. Dunn*, 600 F. App'x 81, 85 (4th Cir. 2015). However, if state personnel are found to have acted with malice, or engaged in tortious conduct outside the scope of employment, then such personnel lose the protection of immunity and would be liable personally for any damages flowing from their conduct. *Id.*; *Lee,* 384 Md. at 267–68 (2004).

"Malice" under the MTCA turns on the subjective intent of the defendant-employee; whether he acted with "evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud." *Marks,* 600 F. App'x at 86 (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)). "Gross negligence is 'an intentional failure to perform a manifest duty in

---

[4] Plaintiffs contention that Defendants forfeited their sovereign immunity removing the case to federal court is not correct. Any sovereign immunity that defendants "may claim in Maryland state court travel[] with them to federal court." *Carter v. Maryland*, No. JKB–12–1789, 2012 WL 6021370, at *4 n.1 (D. Md. Dec. 3, 2012) (citing *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2004)). Accordingly, this Court has previously held that defendants "retain their statutory immunity" as laid out in the MTCA when they "remove[] [a] case to federal court." *Posyton v. Maryland*, No. PWG-16-3887, 2017 WL 3704616, at *9 (D. Md. Aug. 28, 2017); *see also Krell v. Queen Anne's Cty.*, No. JKB-18-637, 2018 WL 6523883, at *12 (D. Md. Dec. 12, 2018) ("[§ 5-522(b)] renders state officials immune from liability in federal court."). Additionally, while the Fourth Circuit has not explicitly addressed his issue, it has implied that sovereign immunity is fully applicable in removal cases by requiring removed plaintiffs to plead the MTCA exceptions of malice or gross negligence. *Nero v. Mosby*, 890 F.3d 106, 131 (4th Cir. 2018); *Young v. City of Mount Ranier*, 238 F.3d 567, 578–79 (4th Cir. 2001); *see also Oliver v. Dep't of Pub. Safety & Corr. Servs.*, 350 F. Supp. 3d 340, 353 (D. Md. 2018); *Traversa v. Ford*, 718 F. Supp. 2d 639, 648 (D. Md. 2010).

reckless disregard of the consequences as affecting the life or property of another.'" *Nero v. Mosby*, 890 F.3d 106, 127–28 (4th Cir. 2018) (quoting *Cooper v. Rodriguez*, 443 Md. 680 (2015)). Gross negligence amounts to "something more than more than simple negligence, and likely more akin to reckless conduct." *Id.* (quoting *Barbre*, 402 Md. at 187).

Dr. Pinn contends that he must be dismissed from this action because Plaintiffs have not pleaded sufficient facts to infer plausibly that he committed tortious acts with malice nor gross negligence. ECF No. 16-2 at 22–24. The Court disagrees.

It is undisputed that Dr. Pinn qualifies as state personnel under the MTCA. Plaintiffs also have pleaded sufficient facts to satisfy the deliberate indifference standard; thus, they have clearly pleaded the lesser gross negligence standard. As to malice, given that Dr. Pinn misled investigators about the orders he communicated during Robinson's transfer out of suicide watch, at this stage the Court will not preclude discovery on whether Dr. Pinn committed the acts with "ill-will or fraud" or "knowing and deliberate wrongdoing." *Marks*, 600 F. App'x at 86. The motion is denied as to Dr. Pinn.

### C. Respondeat Superior

As to the respondeat superior count, the parties do not dispute that "the doctrine of respondeat superior is . . . a means of holding employers, including local governments, vicariously liable for the tortious conduct of an employee acting within the scope of his [or] her employment." *Serio v. Balt. Cty.*, 384 Md. 373, 397 (2004). The doctrine does not give rise to an independent cause of action but is rather theory of liability. *See Ross v. Prince George's Cty.*, No. DKC 11–1094, 2012 WL 1204087, at *1 n.1 (D. Md. Apr. 10, 2012); *Radbod v. Arias*, No. RDB 10-897, 2011 WL 630752, at *3 n.3 (D. Md. Feb. 11, 2011). Accordingly, the Court formally dismisses Count III because it does not aver a separate cause of action. However, the

Court will not strike the Complaint allegations because they provide notice to Defendants that Plaintiffs intend to pursue this avenue of relief. *See Ross*, 2012 WL 1204087, at *1 n.1; *Radbod*, 2011 WL 630752, at *3 n.3.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. A separate order follows.

| | |
|---|---|
| 2/07/2020 | /s/ |
| Date | Paula Xinis |
| | United States District Judge |