## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ARLINDA ROBINSON**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Case No.: DLB-19-1025** |
| **DAVID PYTLEWSKI**, *et al.*, | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

James C. Robinson died by suicide on March 14, 2016, while he was in custody at the Eastern Correctional Institution ("ECI"), a Maryland state prison. Robinson's mother as his estate's personal representative, alongside his minor children through their mother, sued the State of Maryland; the State's mental health services provider, MHM Services, Inc. ("MHM"); MHM psychiatrist Dr. David Pytlewski, M.D.; and State psychologist Dr. Howard M. Pinn, Ph.D. They alleged survival action and wrongful death claims based on negligence, state constitutional claims, and federal constitutional claims under 42 U.S.C. § 1983.

Pending before the Court is Dr. Pytlewski and MHM's (collectively, "MHM defendants") motion for reconsideration of this Court's January 13, 2022 Order partially granting plaintiffs leave to amend the complaint. ECF 83. They ask the Court to dismiss or strike plaintiffs' amended complaint or, in the alternative, to certify the issue for appeal under 28 U.S.C. § 1292(b). Plaintiffs have opposed the motion, ECF 96, and the MHM defendants have replied, ECF 99. No hearing is necessary. *See* Loc. R. 105.6. For the reasons stated in this memorandum opinion, the motion is denied.

I.      **Procedural History**

   A.  **Filing of Original Complaint**

Plaintiffs' original complaint was filed in state court and removed to this Court on April 4, 2019.  ECF 1.[1]  Against all defendants, plaintiffs alleged survival action and wrongful death claims based on negligence, as well as violations of Articles 16 and 25 of the Maryland Declaration of Rights.  ECF 8, ¶¶ 3–6, 61–74, 87–90.  Against the State and MHM, plaintiffs alleged a stand-alone *respondeat superior* count for the actions of their respective employees, Drs. Pinn and Pytlewski.  *Id.* ¶¶ 75–77.  Against Drs. Pinn and Pytlewski in both their individual and official capacities, and against MHM as the private entity providing mental health services for State prisoners, plaintiffs alleged violations of the Eighth and Fourteenth Amendments and sought damages under 42 U.S.C. § 1983.  *Id.* ¶¶ 78–86.

In their complaint, plaintiffs explained Robinson's mental health diagnosis and treatment history and described defendants' roles in both.  In 2007, while in the custody of the Maryland Division of Corrections ("DOC") for the first time, Robinson was diagnosed with bipolar disorder. *Id.* ¶ 16.  He was prescribed psychotropic medication.  *Id.*  Beginning in 1992, he made several suicide attempts both in and out of custody.  *Id.*  His DOC medical files included this mental health history.  *Id.*

In 2015, Robinson was arrested and detained at the Howard County Detention Center, where he was placed on suicide watch.  *Id.* ¶¶ 13–14.  On October 2, 2015, he was sentenced to one year and one day imprisonment.  *Id.* ¶ 14.  Three days later, he was transferred to DOC custody

---

[1] Plaintiffs filed two prior complaints in state court.  On December 4, 2017, plaintiffs filed a medical malpractice suit against defendants in the Circuit Court for Baltimore City, and they filed an amended complaint on April 6, 2018.  *See* https://casesearch.courts.state.md.us/casesearch/ inquiryDetail.jis?caseId=24C17006044&loc=69&detailLoc=CC.  On June 26, 2018, they filed a stipulation of dismissal.  *Id.*

and began serving his sentence at Jessup Correctional Institution ("JCI"). *Id.* ¶ 15.  Upon his arrival at JCI, he underwent a psychiatric evaluation. *Id.*  Three weeks later, he was evaluated again and diagnosed with a psychotic disorder, schizoaffective disorder, and a personality disorder. *Id.* ¶ 17.  On October 25, he was "placed under close observation for self-injurious behavior." *Id.* His progress notes from the next day state that he "was not taking his psychiatric medications" and "was complaining of suicidal ideations." *Id.* ¶ 18.

At the recommendation of his treating psychiatrist at JCI, Robinson was transferred on October 28 to the Patuxent Institution "for additional psychiatric care." *Id.* ¶¶ 18–19.  On January 8, 2016, Patuxent staff found Robinson "with a bedsheet tied around his neck in an apparent suicide attempt." *Id.* ¶ 20.  He was placed on "administrative segregation for suicide prevention." *Id.*

On February 2, 2016, Robinson was transferred to ECI, where he did not receive the initial formal suicide screening required by Maryland Department of Public Safety and Correctional Services ("DPSCS") policy. *Id.* ¶¶ 21–22.  On arrival, "he refused to take his prescription psychotropic medications." *Id.* ¶ 21.  The ECI medical staff did not examine Robinson until February 9, one week after his arrival. *Id.* ¶¶ 22–24.  At that time, Dr. Pinn, a psychologist employed by the State of Maryland, evaluated Robinson to determine where he should be housed within the facility. *Id.* ¶ 24.  Dr. Pinn "recommended a trial in general population" while Robinson's medication was monitored, in light of his "history of suicidal ideations." *Id.*

The next day, Dr. Pytlewski, a psychiatrist employed by MHM, conducted a psychiatric evaluation of Robinson and noted his history of serious mental illness. *Id.* ¶¶ 5, 25.  Robinson reported that he was taking his medication, that his "hallucinations . . . were minimal[,] and that he had no suicidal ideations or suicide plan." *Id.* ¶ 25.  "Dr. Pytlewski diagnosed Mr. Robinson with schizoaffective disorder, renewed his psychotropic . . . medication prescriptions, and

recommended a follow up visit in twelve weeks." *Id.*  The only effort Dr. Pytlewski made to confirm or track Robinson's medication levels was to order bloodwork to be performed two months later.  *Id.* ¶ 25.  He did not complete the suicide screening or the mandatory suicide screening form that DPSCS policy required.  *Id.* ¶ 26.

On February 10 and 11, 2016, Robinson went to ECI's medical department repeatedly with complaints of chest pains.  *Id.* ¶ 27.  The medical staff noted he "appeared . . . disorganized, [was] speaking tangentially, [and was] inappropriate, and very unclear."  *Id.*  They asked Dr. Pinn "to intervene."  *Id.*  Dr. Pinn consulted Dr. Pytlewski, and they concluded, without examining Robinson, that he was stable if he was on his medication.  *Id.* ¶¶ 27–28.  They attributed his behavior to his "intellectual deficits" and directed the medical staff to "closely guard[]" him when he visited the medical department.  *Id.* ¶ 28.

One week later, on February 18, Dr. Pinn met with Robinson and observed that he "remained difficult to focus and very scattered."  *Id.* ¶ 30.  Robinson reported that it was difficult to wake up for his morning medication, and Dr. Pinn noted that the "lack of full medication maybe [sic] contributing to his very scattered, poorly focused and odd behavior."  *Id.*

On February 25, Robinson visited the ECI medical department again due to chest pain, and then again on March 7, when he reported suicidal ideations and continued difficulty taking his morning medication.  *Id.* ¶¶ 31–32.  Specifically, he said to medical staff that he felt "like taking a sheet and tying it around [his] neck and hanging it up."  *Id.* ¶ 32.  Drs. Pytlewski and Pinn were aware at that time that Robinson's long-term relationship with his children's mother was likely to end.  *Id.* ¶ 33.  Dr. Pytlewski placed Robinson on "administrative segregation suicide watch."  *Id.* ¶ 32.

On March 8, Drs. Pytlewski and Pinn both examined Robinson.  Robinson admitted that he was not taking his medication, and the doctors observed that he was "moderately/severely depressed" and spent the examination lying on the floor in a "suicide blanket."  *Id.* ¶ 34.  The doctors were aware that Robinson had received a disciplinary infraction for committing a "lewd act" and that the infraction could extend his prison term.  *Id.* ¶¶ 35 & n.2, 49.  Dr. Pytlewski ordered that Robinson remain on "Level 1 administrative segregation observation" and that he "continue with his medication."  *Id.* ¶ 34.

Drs. Pytlewski and Pinn met with Robinson on the next day two days.  On March 9, Robinson "lay on the floor of his cell wrapped in a suicide blanket" and refused to speak to them.  *Id.* ¶ 36.  On March 10, however, he stated he was "compliant with his medication[,] and . . . he denied suicidal ideations."  *Id.* ¶ 37.  Yet Robinson had refused his medication that morning.  *Id.* ¶ 38.  Notwithstanding his presentation the day prior, the doctors approved Robinson for a next-day transfer "to a less restrictive housing tier."  *Id.* ¶¶ 36–37.  They conditioned his transfer on his "compliance with his prescribed medication" and his "being double celled [i.e., housed in a cell with another prisoner] so that another prisoner could notify staff if Mr. Robinson's condition deteriorated or if he attempted suicide."  *Id.* ¶ 37.  The "medical staff was to be informed immediately" if Robinson "was not compliant with his medication."  *Id.*

To communicate these conditions as part of their medical order, the doctors had to place the order in Robinson's "base file" to make "correctional staff and other DPSCS personnel" aware of the "specific requirements or restrictions that the [d]efendants believe[d] [were] necessary for the care, treatment, and safety of [the] prisoner."  *Id.* ¶ 39.  But the doctors "failed to properly document and communicate their orders and failed to inform the individuals responsible for the transfer and housing of Mr. Robinson that he was not to be single celled and that his medications

were to be closely monitored." *Id.* ¶ 41.  During an internal investigation following Robinson's death, ECI staff reported that they did not receive these orders and that the form Dr. Pinn had completed, which purportedly documented the doctors' orders, did not include an order that Robinson always be housed with another inmate. *Id.* ¶ 53; ECF 8-1, at 10.[2]  In addition, the doctors did not perform a suicide assessment and thus did not document the results of a suicide assessment in Robinson's electronic health record.  ECF 8, ¶ 40.  Nor did they "place appropriate property restrictions on Mr. Robinson (i.e.[,] no bed linens)" or "provide their recommendations to the ECI shift commanders." *Id.*  And they did not tell ECI correctional staff that Robinson had "to be re-evaluated and placed back on administrative segregation should he become noncompliant with his medication." *Id.* ¶ 42.  The doctors had no further contact with Robinson after his transfer to a less restrictive housing tier, and they did not follow up with ECI staff. *Id.* ¶ 43.

After he was transferred from suicide watch on March 10, Robinson was housed with another prisoner. *Id.* ¶ 44.  He refused his medication again later that day and on March 11 and 12. *Id.* ¶¶ 38, 44, 45, 46.  His cellmate was removed from the cell on March 12. *Id.* ¶ 46.  Robinson took his medication on March 13 but not on March 14. *Id.* ¶¶ 47–48.  At a disciplinary hearing on March 14, he lost good conduct credits, which extended his prison term; Drs. Pinn and Pytlewski were aware of the hearing and its outcome. *Id.* ¶ 49.  On the evening of March 14, Robinson was found dead by suicide, with a sheet tied around his neck. *Id.* ¶ 50.

Plaintiffs claimed that Drs. Pinn and Pytlewski were deliberately indifferent and/or negligent in the care they provided for Robinson and that MHM and the State were liable as their employers.  Additionally, plaintiffs claimed MHM was "independently liable for its own deliberate

---

[2] Dr. Pinn admitted in the investigation that he did not memorialize his orders. *Id.* ¶¶ 51, 53.  He claimed that Dr. Pytlewski verbally directed ECI correctional staff to "double cell" Robinson. *Id.*

indifference to the risk of serious harm by prisoners at ECI and/or negligence with respect to its protocols." *Id.* ¶ 59. They alleged that MHM had "the obligation to provide protocols that establish appropriate care for prisoners in the facilities where MHM provides medical care" and that "[i]t failed in this case to do so." *Id.* In their § 1983 claim against MHM and the individual defendants, plaintiffs alleged:

> Defendant MHM demonstrated deliberate indifference to the known medical needs of Mr. Robinson by failing to ensure that proper controls and/or protocols were in place to monitor prisoners with severe mental illness, to monitor prisoners with suicidal ideations and tendencies, to monitor prisoners with prescriptions for psychotropic medications, to respond to prisoners' acute conditions and severe medical symptoms, or to provide prisoners with appropriate treatment for their medical conditions while housed at ECI.

*Id.* ¶ 84. They claimed that, "[a]s a result of MHM's failures to implement and/or enforce appropriate controls and protocols for the care [o]f prisoners at ECI, Mr. Robinson needlessly suffered and ultimately died." *Id.* ¶ 85. Plaintiffs asserted similar allegations against MHM in support of their survival action claim. *Id*. ¶ 67; *see id.* ¶¶ 68–69. They asserted that Robinson's suffering and death "occurred as a foreseeable and direct result of the negligence and the breaches of the standard of reasonable medical care by the Defendants." *Id.* ¶¶ 69–70. Additionally, in their wrongful death claim, plaintiffs sought to recover for their own loss and suffering that occurred "[a]s a direct and proximate result of the deliberately indifferent and/or negligent acts and omissions of the Defendants in causing Mr. Robinson's death." *Id.* ¶ 74.

### B.  Motion to Dismiss

MHM and Dr. Pytlewski answered the complaint, ECF 14, and the State and Dr. Pinn (collectively, "State defendants") moved to dismiss the claims against them, ECF 16. MHM and Dr. Pytlewski joined in the motion. ECF 26. The State defendants sought dismissal of the survival action, wrongful death, *respondeat superior*, state constitutional, and § 1983 claims. As to the § 1983 claim, they challenged the claim's sufficiency as alleged against the individuals, not MHM.

The Court granted in part and denied in part the motion, dismissing only the *respondeat superior* claim because it is a theory of liability, not a cause of action.  ECF 34.  The Court found the remaining claims were pleaded sufficiently, including the § 1983 claim against the individuals. The Court did not address whether the § 1983 claim against MHM was adequately pleaded because the parties did not raise that issue in the motion to dismiss briefing.[3]

## C.  Discovery

Discovery commenced on June 9, 2020.  ECF 41.  On April 5, 2021, plaintiffs filed a letter communicating their intention to file a motion to compel discovery.  ECF 61.  They stated, as relevant here, that the State refused to provide information and documents "relating to monitoring and oversight mechanisms designed to track prison suicide rates, causes, and trends, which form the basis for corrective action plans and policy changes."  *Id.* at 2.  According to plaintiffs, the withheld "documents also contain[] information that the State shares with MHM as part of an ongoing effort to identify suicide trends and risk factors . . . for the purpose of implementing and/or

---

[3] MHM asserts it moved to dismiss all claims against it and Dr. Pytlewski, including the § 1983 claim.  ECF 99, at 10–11.  While it is true that MHM asked the Court to dismiss "all claims Plaintiffs brought against Dr. Pytlewski and MHM" in its motion to join the State's motion to dismiss, ECF 26, at 3, neither the State nor MHM argued in the briefing that plaintiffs failed to state a § 1983 claim against MHM, *see* ECF 16, 25, 26.  The parties discuss, at various points in the briefing on the motion for reconsideration, whether the allegations in the original complaint were sufficient to allege a § 1983 claim against MHM.  The Court will not, at this point, speculate as to whether the *Monell* claim against MHM would have survived a motion to dismiss.  The Court notes, however, "only the notice pleading requirements of Federal Rule of Civil Procedure 8 appl[y] to *Monell* claims," and this Court repeatedly has "held that a plaintiff need only allege that the municipality 'was aware of ongoing constitutional violations,' and that this awareness allowed the custom of unconstitutional practices to continue developing," which is a "forgiving standard." *Sulton v. Baltimore Cnty., Md.*, No. SAG-18-2864, 2021 WL 948820, at *7 (D. Md. Mar. 12, 2021) (quoting *Garcia v. Montgomery Cnty.*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168–69 (1993)); *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *6 (D. Md. Aug. 7, 2018); *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017).

amending suicide prevention protocols." *Id.*  The State "object[ed] to this category of requests as overbroad, unduly burdensome, and as seeking irrelevant documents." *Id.*  Plaintiffs did not provide any substantive details about alleged deficiencies with MHM's interrogatory responses and document production. *Id.*[4]  Many of the issues raised by the discovery disputes reflected the parties' disagreement over the scope of the allegations and claims in the complaint.

### D.  Motion to Amend

On May 20, 2021, nine months after the deadline for amending pleadings had passed, plaintiffs filed a motion for leave to amend the complaint.  ECF 63.  In their motion, plaintiffs sought to add two claims under the Americans with Disabilities Act ("ADA") and over 200 paragraphs of factual allegations relating to the history of the State's and MHM's treatment of Maryland state prisoners with serious mental health issues.  *Compare* ECF 8, *with* ECF 63-1. While the new factual allegations are too lengthy to recite in full, a summary follows.

MHM has been the State's exclusive psychiatric services contractor at Maryland correctional facilities since 2006.  ECF 63-1, ¶ 61.  MHM and the State have had access to each other's relevant internal documents and reports regarding mental health services and, more specifically, suicide monitoring and prevention.  *Id.*  The State and MHM have had a pattern and practice of providing inadequate mental health services to prisoners with severe mental illness since 2006, during which time they have been audited, made aware of the inadequacies in their service provision, and directed to cure the deficiencies—but have failed to do so.  *Id.* ¶¶ 63–68.

---

[4] The Court did not address plaintiffs' letter of intent to compel discovery and plaintiffs did not file their motions to compel until October 21, 2021, after their motion for leave to amend had been pending five months.  ECF 71, 72.  In one motion to compel, plaintiffs sought, among other things, all policies MHM required psychiatrists to follow between January 1, 2010, and May 1, 2016; documents relating to MHM's communication protocols between MHM employees and the State concerning individuals receiving psychiatric care; and "[a]ll documents reflecting prior incidents at ECI similar to the circumstances described in the complaint."  ECF 72-1, at 8-9.

Deficiencies included prescription monitoring and provider access to patient charts and medical histories. *Id.* ¶¶ 64–65. A 2012 assessment found deficiencies in mental health interventions, insufficient staffing, and issues with the use of segregated confinement for prisoners with severe mental illness. *Id.* ¶¶ 69–73. The assessment made recommendations to ensure prisoners with severe mental illness received appropriate care. *Id.* The 2007 performance audit report, the State's 2017 response, a 2010 follow-up review by the Maryland Office of Legislative Audits, and an assessment of the State's use of segregated confinement all demonstrate widespread, pervasive problems that put incarcerated people with mental illness at risk. *Id.* ¶¶ 63, 67, 68, 69. In addition, in 2014, the ACLU issued a paper about risks associated with using solitary or segregated confinement for prisoners with severe mental illness. *Id.* ¶ 75. Based on these documents, plaintiffs allege the State and MHM were aware at the time of Robinson's death that continuing deficiencies in the use of electronic records resulted in gaps in the continuity of care. *Id.* ¶¶ 77–78.

Additionally, in the approximately ten years before Robinson's death, the State and MHM were aware of factors contributing to a heightened risk of suicide for prisoners with severe mental illness but failed to institute or enforce policies to eliminate these factors. *Id.* ¶¶ 80–86. Factors included the use of segregated confinement for mental health reasons; understaffing; an increase in the mental health caseload since 2007; inadequate facilities; poor identification and classification of mental health needs; failure to provide adequate treatment plans, psychotherapy, counseling, or mandated out-of-cell time for prisoners with severe mental illness; and inadequate suicide prevention and crisis care. *Id.* ¶¶ 79, 87–175, 183–97, 219. Another factor was the inappropriate use of disciplinary actions to punish prisoners, including Robinson, for symptoms of mental illness, despite a written policy prohibiting this use of disciplinary actions. *Id.* ¶¶ 176–

82.   Other factors included the lack of a system for determining whether segregation was appropriate based on a prisoner's mental health needs; a problematic use of single cells; and the failure to prevent prisoners from accessing the means required for death by suicide, such as bedsheets.  *Id.* ¶¶ 199–207, 209–14.

MHM was aware of its inability to provide adequate care and the risks caused by its deficient care provision and its failure to comply with governing regulations.  *Id.* ¶¶ 87–175, 183–97, 219.  MHM knew the effects of understaffing and overcrowding on prisoners with severe mental illness and knew it failed to meet its contractual requirements for staffing, suicide risk assessments, counseling, programming, observation, evaluations, medication monitoring, medical recordkeeping, and limiting the use of administrative segregation.  *Id.* ¶¶ 220–36.  MHM instituted a corrective action plan to address suicide risk factors, including single-celling and segregating, but it failed either to disseminate or to implement the plan.  *Id.* ¶¶ 237–45.  Three suicides in the approximately one-year period before Robinson's death "highlighted the suicide risk factors for prisoners with [severe mental illness]" and showed defendants failed to take action to change their treatment and care of prisoners with severe mental illness.  *Id.* ¶¶ 247–54.  In sum, MHM was aware of steps that could have prevented Robinson's death but failed to take any corrective action. *Id.* ¶¶ 255–57, 260.

The defendants opposed the amendment, arguing plaintiffs could not establish good cause under Rule 16 to excuse the late request for leave to amend and the amendment would be futile and prejudicial under Rule 15.  ECF 64–66.  As to futility, they argued the new factual allegations did not relate back to the original complaint, as required by Federal Rule of Civil Procedure 15(c)(1)(B), and that the new allegations were therefore time-barred under Maryland's three-year

statute of limitations, which expired on March 14, 2019, three years after Robinson's death.  ECF 64, at 12–13; ECF 65, at 9.

During a January 12, 2022 hearing, the Court granted in part and denied in part the motion for leave to amend.[5]  ECF 80, 81, 91.  As relevant to the pending motion for reconsideration, the Court considered whether plaintiffs could amend their complaint by adding over 200 paragraphs of new factual allegations related to the State's and MHM's history of treatment of prisoners with serious mental illness.  The Court found the plaintiffs established good cause for not seeking leave to add the allegations by the amendment deadline.  ECF 91, at 55:5–8.  Although plaintiffs could have asserted some of the allegations before the deadline—those relating to studies that occurred years earlier and were on the internet, e.g., ECF 63-1, ¶¶ 75, 76 n.5—many of the allegations were learned through the February 22, 2021 deposition of Dr. Lynda Bonieskie, Ph.D., the State Deputy Director of Mental Health, and the March 16, 2021 deposition of Dr. Sharon Baucom, M.D., the State Chief Medical Officer and Director of Clinical Services for DPCSC.  E.g., ECF 63-1, ¶¶ 63–73, 77–78, 80–81, 88–91, 93–93, 103, 131; ECF 91, at 29:12–22.  From Dr. Bonieskie's testimony, plaintiffs learned "new facts that highlighted the systemic issues regarding mental health care in Maryland's prisons," including understaffing and "medication administration issues" that were present in 2016 and ongoing in 2021, such as a failure to "store medication administration records . . . electronically."  ECF 69, at 5–6.  They claimed that Dr. Baucom "elaborated on Dr. Bonieskie's testimony and explained that both the State and MHM maintain data management storage systems to preserve monthly minutes, corrective action plans, quality control audits, and suicide trend

---

[5] The Court will not discuss the proposed ADA claims here because leave to amend to add those claims was denied and that decision is not at issue here.  ECF 91, at 52:16–22; ECF 83.  The Court denied leave to add the ADA claims because plaintiffs knew or should have known about the basis for the claims before filing suit.

data." *Id.* at 8.  Those allegations could not have been uncovered before the depositions were taken, a fact the MHM defendants do not contest.[6]

The Court then considered whether plaintiffs acted in bad faith and whether defendants would be prejudiced by the amendment.  ECF 91, at 55:9 – 56:12.  Finding neither, the Court considered whether amendment would have been futile.  *Id.* at 56:13 – 59:3.  At this point, the Court made two alternative findings.  First, the Court found that the relation back rule did not apply because plaintiffs were not asserting new, potentially time-barred claims; rather, they were asserting additional, detailed allegations in support of the existing claims, particularly the § 1983 and negligence claims.  *Id.* at 57:2–7.  Second, the Court found, to the extent the relation back rule did apply, the rule's requirements were met because the new allegations did not establish a new cause of action and instead concerned MHM's state of mind, notice, knowledge, breach, and responsibility for Robinson's death—all of which were at issue in the original complaint.  *Id.* at 57:7–18.  The Court also found the defendants had notice of the new allegations because they were similar to the allegations in the original complaint concerning the failure to implement protocols and controls to ensure the safety of incarcerated people with mental health issues.  *Id.* at 57:19 – 58:16.  And, the Court noted again that no prejudice would result from the amendment because the case was still in the discovery phase and no trial date had been set.  *Id.* at 58:22 – 59:3.

The amended complaint was filed on January 18, 2022.

---

[6] That some of the new allegations were available in the public domain for years and could have been included in the original complaint did not warrant excising them from the amended complaint when most of the new allegations—including the more case-specific ones—were not discovered until the depositions of prison and MHM officials in this case.

### E.  Motion for Reconsideration

MHM and Dr. Pytlewski seek reconsideration, under Federal Rule of Civil Procedure 54(b), of the Court's January 13, 2022 Order, ECF 81, partially granting plaintiffs leave to file an amended complaint.  ECF 83.  They argue the Court erred by finding that good cause justified the delayed motion for leave to amend the complaint and that amendment was not futile.  In their view, the new allegations do not relate back because they concern different actors, time periods, and conduct and therefore do not share a factual nexus with the original complaint.  They also disagree with the Court's conclusions that they had sufficient notice of the new allegations and would not be prejudiced by the amendment.  And, they advance a new futility argument that amendment would be futile because the new allegations are not causally related to Robinson's death.  These errors, they argue, have caused manifest injustice.  In a footnote, they also ask the Court to construe the motion as one to dismiss the amended complaint and to strike the amended complaint.  ECF 83, at 1 n.1; ECF 83-1, at 1 n.2.  In the event the motion is denied, they ask the Court to certify the Court's January 13, 2022 Order for interlocutory appeal.

## II.    Standard of Review

Federal Rule of Civil Procedure 54(b) provides that "any order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b).  Under Rule 54(b)—as compared to Rules 59(e) and 60(b), which govern challenges to final judgments—the Court has "broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light."  *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 256 (4th Cir. 2018) (quoting *Carlson v. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).

The Court's discretion under Rule 54(b), however, "is not limitless" and "is 'subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* at 256–57 (quoting *Off. Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal quotation marks omitted)).  Accordingly, the Court may revise its January 13, 2022 Order "under the same circumstances in which it may depart from the law of the case: (1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Id.* at 257 (quoting *Carlson*, 856 F.3d at 325). As to the third circumstance requiring clear error, which is at issue here, "[a] prior decision does not qualify for th[is] exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.  It must be dead wrong." *Id.* at 258 (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)).

## III.    Discussion

The principal contention in the motion for reconsideration is that the Court misapplied the relation back rule by focusing on whether the amended complaint raised a new cause of action rather than whether there was a factual nexus between the proposed amended complaint and the

original complaint.  ECF 83-1, at 15–16.  While the Court does not agree it erred, it does agree

that the record on this point needs clarification.[7]

## A. Relation Back Rule

Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so

requires."  Fed. R. Civ. P. 15(a)(2).  Additionally, Fourth Circuit "policy . . . liberally allow[s]

amendment in keeping with the spirit of Federal Rule of Civil Procedure 15(a)."  *Scott v. Family*

*Dollar Stores, Inc.*, 733 F.3d 105, 112 (4th Cir. 2013) (quoting *Galustian v. Peter*, 591 F.3d 724,

729 (4th Cir. 2010)).  Of course, there is no need to allow amendment to bring a claim barred by

the statute of limitations.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (futility of claim justifies

denial of leave to amend).  Therefore, when a party seeks leave to amend to bring an untimely

claim, the Court considers whether the claim is "saved by the relation-back authorized by Rule

15(c)."  *Goodman v. Praxair, Inc.*, 494 F.3d 458, 466 (4th Cir. 2007).  If an amended complaint

relates back, it shares "the filing date of the original complaint."  *Id.*

---

[7] The Court already considered and rejected the MHM defendants' arguments regarding good cause, notice, and prejudice, all of which were raised in the opposition to plaintiffs' motion for leave to amend and during the hearing.  *Compare* ECF 83-1, at 9–10 (arguing on reconsideration plaintiffs failed to demonstrate good cause for untimely amending the complaint), *with* ECF 65, at 6–9 (opposing the motion for leave to amend the complaint on the grounds that plaintiffs failed to demonstrate good cause justified the delay); *see* ECF 91, at 52:23 – 55:8 (finding plaintiffs demonstrated good cause for untimely filing the amended complaint with respect to the non-ADA counts).  *Compare* ECF 83-1, at 11–13, 17 (arguing there is no factual nexus between the amended complaint and the original complaint), ECF 83-1, at 14–15 (arguing defendants lacked notice of the allegations contained in the amended complaint), ECF 83-1, at 19–20 (arguing permitting the amended complaint prejudices defendants), *and* ECF 83-1, at 12–14 (arguing the amended complaint alleges a pattern or practice theory and that this is a new cause of action and consequently does not relate back to the original complaint), *with* ECF 65, at 9–13 (arguing the amended allegations did not relate back to the original complaint); *see* ECF 91, at 56:13 – 57:7 (finding the relation back doctrine did not apply and that the plaintiffs did not assert a new claim in the amended complaint). The Court finds no clear error resulting in a manifest injustice that would warrant reconsideration of those findings.

Under Rule 15(c)(1)(B), "an amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).[8]  To relate back, "there must be a factual nexus between the amendment and the original complaint." *Grattan v. Burnett*, 710 F.2d 160, 163 (4th Cir. 1983), *aff'd* 468 U.S. 42 (1984).  That is, "the amended claims and the original claims [must] share a core of operative facts."  Steven S. Gensler, *Federal Rules of Civil Procedure: Rules & Commentary* ("*Rules & Commentary*") Rule 15 (2022).  If "there is some factual nexus, an amended claim is liberally construed to relate back to the original complaint if the defendant had notice of the claim and will not be prejudiced by the amendment." *Grattan*, 710 F.2d at 163; *Bradley v. Veterinary Orthopedic Sports Med. Grp.*, No. DKC-19-2662, 2022 WL 703916, at *8 (D. Md. Mar. 9, 2022).  Thus, "relation back is proper when the amended complaint amplifies the existing allegations or makes the existing allegations more definite and precise" by "present[ing] additional facts."  Gensler, *Rules & Commentary* Rule 15.  Relation back also is proper even if the amendment presents a "new claim [that] involve[s] different sources of proof" or "new legal theories," as long as "the core facts are the same."  *Id.*  In contrast, relation back is not proper if the amendment presents "new claims [that] arise from an entirely different event or set of facts."  *Id.*

"Rule 15(c) must be understood to freely permit amendment of pleadings and their relation-back so long as the policies of statutes of limitations have been effectively served." *Goodman*, 494 F.3d at 468.  Thus, the "fundamental question" in deciding whether a claim relates back under

---

[8] Rule 15(c)(1)(A) states that an amendment may relate back if "the law that provides the applicable statute of limitations allows relation back."  Rule 15(c)(1)(C) provides that an amendment may relate back under certain circumstances when, instead of bringing a new claim or defense, "the amendment changes the party or the naming of the party against whom a claim is asserted."  Neither is the case here.

Rule 15(c)(1)(B) "is whether the original complaint served the notice-giving purpose of the limitations period by providing fair notice—within the applicable limitations period—of the basis for liability that was added in the amended complaint."  Gensler, *Rules & Commentary* Rule 15. "The rationale is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." *Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n.3 (1984).

The Fourth Circuit's decision in *Grattan*, 710 F.2d 160, provides guidance.  There, the Fourth Circuit reversed a district court decision disallowing the addition of new claims that the lower court found were barred by the statute of limitations.  The plaintiffs were former college employees who brought claims against Coppin State University alleging their termination was "arbitrary, capricious, without basis in fact or law, illegal and invalid under the Maryland and Federal constitutions." *Id.* at 161.  They did not specifically allege race or sex discrimination in their original complaint, even though they had "filed . . . claims of race and sex discrimination with the Equal Employment Opportunity Commission . . . immediately upon learning of their pending termination." *Id.*  Four years after filing their original complaint, plaintiffs filed an amended complaint adding, among others, race and sex employment discrimination claims under 42 U.S.C. §§ 1981, 1983, and 1985. *Id.* at 161–62.  The district court found that the claims were barred by the statute of limitations. *Id.* at 162.  On appeal, the Fourth Circuit held the discrimination claims related back to the original complaint. *Id.* at 163.  It reasoned that "[t]here [was] a factual nexus between the discrimination claims . . . and [the original] complaint of arbitrary dismissal" because "[b]oth concern[ed] the events leading up to the[] termination . . . and in both the termination was the ultimate wrong of which they complained." *Id.*

Two other Fourth Circuit decisions, albeit per curiam and unpublished, provide additional guidance. In *Florida Steel Corporation v. New Jersey Steel Corporation*, three corporations filed an involuntary bankruptcy petition against a fourth corporation, Valley Steel. 966 F.2d 1442, 1992 WL 119864, at *1 (4th Cir. June 4, 1992) (per curiam) (unpublished table decision). Valley Steel moved to dismiss the petition for failure to state a claim, and the three corporations filed an amended petition to remedy the deficiency by alleging for the first time that "Valley Steel was not paying its debts when due." *Id.* Despite the amendment, the bankruptcy court granted the motion to dismiss. *Id.* On appeal, the district court concluded that the amended petition stated a claim and related back to an original pleading, and on that basis, it reversed the bankruptcy court's dismissal. *Id.* The Fourth Circuit affirmed. *Id.* It observed that Rule 15(c), which applied in the bankruptcy proceeding, required that there was "a factual nexus between the amendment and the original pleading," that the amendment did not prejudice the opposing party, and, of utmost importance, that "the opposing party . . . had notice of the claim." *Id.* (citing *Grattan*, 710 F.2d at 163). The Fourth Circuit concluded that the original and amended petition shared a factual nexus because both "refer[red] to certain debts owed by Valley Steel to Appellees and state[d] that, based on these debts, an involuntary petition in bankruptcy is being filed," and that "the original petition attempted to state that Valley Steel was not paying its debts when due," such that "Rule 15(c) allow[ed] relation back." *Id.* at *2. The Court also found that Valley Steel had sufficient notice of "[t]he allegation that [it] was not paying its debts when due," and there was "no prejudice in allowing the relation back." *Id.*

Conversely, in *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, the Fourth Circuit concluded that the relation back doctrine did not save an untimely defamation claim. 172 F.3d 862, 1999 WL 89125, at *3 (4th Cir. 1999) (unpublished table decision) (per curiam). There, the

plaintiff initially alleged defamation based on two letters sent by W.C. Rouse & Son., Inc. ("Rouse") to the same people. *Id.* at *2. His amended complaint asserted another defamation claim based on a different letter sent from a Rouse employee to a different person on a different date. *Id.* Affirming the district court's dismissal of the additional defamation claim as time-barred, the Fourth Circuit found that the late-filed defamation count "[did] not arise out of the same conduct, transaction, or occurrence described in the original complaint, and, therefore, that the claim [did] not relate back to the filing of the original complaint." *Id.* The Court reasoned that the "letter had a different author and recipient than the [other] letters," that it "was published on a different date," and that it was "a separate act of defamation." *Id.* at *3. This Court has reasoned similarly in cases that likewise involved new assertions of distinct wrongs arising out of different facts. *See, e.g.*, *Brightwell v. Hershberger*, No. DKC-11-3278, 2016 WL 4537766, at *5 (D. Md. Aug. 31, 2016) (finding new claims did not relate back where plaintiff initially brought state tort and § 1983 claims based on an alleged prison assault and then sought to add new state tort and § 1983 claims concerning different assaults, perpetrated by different individuals 16 months before the assault alleged in the original complaint); *AIG Prop. Cas. Co. v. Eaton Corp.*, No. JKB-18-1853, 2019 WL 1586253, at *4–6 (D. Md. Apr. 12, 2019) (finding no factual nexus in products liability case where original complaint related to one product and the amended complaint alleged the same injury from a different product).

### B.  Relation Back Analysis

Plaintiffs' amended complaint relates back to the original complaint because the allegations in the amended complaint concern the same core facts and ultimate wrong alleged in the original complaint: the systemic failures and insufficient policies of MHM and the State that allegedly caused Robinson's suffering and death. The relation back is apparent after an explanation of the

claims asserted in both complaints and a comparison of the original allegations with the new allegations.

In both their original and amended complaints, plaintiffs assert survival action, wrongful death, and state constitutional claims against all defendants, and a § 1983 claim based on a violation of Robinson's Eighth and Fourteenth Amendment rights against MHM and Drs. Pinn and Pytlewski.  No additional claims are asserted in the amended complaint.

Plaintiffs' survival action and wrongful death claims are both negligence claims.  *See Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021); *Smith v. Borello*, 804 A.2d 1151, 1154 (Md. 2002); Md. Code Ann., Est. & Trusts § 7-401(y)(1); Md. Code Ann., Cts. & Jud. Proc. § 3-904.  Thus, to prove the wrongful death and survival action claims, plaintiffs must establish: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty[,] (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Tchakounte v. Uber Techs., Inc.*, No. CCB-20-3028, 2022 WL 326727, at *2 (D. Md. Feb. 3, 2022) (quoting *Dehn v. Edgecombe*, 865 A.2d 603, 611 (Md. 2005)) (discussing survival action and wrongful death claims).  A negligent act or omission is the proximate cause of an injury if it is both the "cause in fact" and "a legally cognizable cause." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195 (Md. 2012) (quoting *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009)).  Whether conduct is "'a legally cognizable cause of the complainant's injuries[]' is a test of foreseeability," under which the Court "'consider[s] whether the actual legal harm to a litigant falls within a general field of danger that the actor should have anticipated or expected.'" *Neal v. United States*, No. ELH-19-1033, 2022 WL 1155903, at *13 (D. Md. Apr. 19, 2022) (quoting *Pittway Corp.*, 973 A.2d at 787–88).

Section 1983 provides a federal cause of action for any individual who believes a person acting under color of state law has deprived him or her of a constitutional right.  *See* 42 U.S.C. § 1983; *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 707 (1999).   A municipality (which necessarily acts under color of state law) or a private corporation that is acting on behalf of a state actor (and therefore acts under color of state law)—e.g., MHM—may qualify as a "person" under § 1983 and may be found liable on what is called a "*Monell*" claim under limited circumstances. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipal liability under § 1983); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) (liability of a private corporation under § 1983).  To state a *Monell* claim against a private corporation acting under color of state law, the plaintiff must "identify a . . . 'policy' or 'custom' that caused the plaintiff's injury."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997); *see Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).  A policy or custom may be established in any of four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle*, 326 F.3d at 471 (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir.1999)); *see Lehan v. Wilson*, No. GJH-21-362, 2022 WL 703928, at *6 (D. Md. Mar. 8, 2022) (quoting *Lytle*).  An entity "may not be held liable under § 1983 solely because it employs a tortfeasor," and the Court will not impose liability "under a theory of *respondeat superior*."  *Bd. of Cnty. Comm'rs*, 520 U.S. at 403 (citing *Monell*, 436 U.S. at 694); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982) (noting that liability of a private corporation under § 1983/*Monell*, like local government liability under § 1983/*Monell*, requires more than *respondeat superior*).

In support of the survival action and § 1983 claims against MHM in the original complaint, plaintiffs alleged that MHM failed to ensure that there were "proper controls and/or protocols" to monitor and provide treatment for prisoners with severe mental illness.  ECF 8, ¶¶ 67, 84.  They claimed that these "failures to implement and/or enforce appropriate controls and protocols" caused Robinson's suffering and death.  *Id.* ¶¶ 68–70, 85.  A reasonable interpretation of these allegations is that MHM did not have effective policies for treating people with severe mental illness at ECI and that MHM engaged in a practice of failing to implement or enforce effective policies at the prison, despite its knowledge of the ineffectiveness of its policies and customs.  These prison-wide failures allegedly constituted a breach of MHM's duty of care and were a foreseeable cause of Robinson's suffering and death.  While the allegations in the original complaint were far from robust, as plaintiffs concede, they made clear when discovery opened that MHM faced negligence and *Monell* claims based on the ineffectiveness of its policies and customs.

In the amended complaint, plaintiffs considerably expand the allegations supporting the existing negligence and *Monell* claims.  They add over 200 paragraphs of allegations concerning the State's and MHM's statewide practices relating to care for individuals with severe mental illness.  Plaintiffs cite deficiencies in MHM's delivery of mental health services that were identified in the years leading up to Robinson's death and were still uncorrected when Robinson died.  ECF 82, ¶¶ 63–77.  Plaintiffs allege that MHM knew of and failed to cure its programmatic insufficiencies.  *Id.* ¶¶ 78–80.  They allege that "[t]he State and MHM identified numerous systemic and individual failures that caused or contributed to Mr. Robinson's untimely and preventable death," including the failure to refer him "to a more acute mental health facility within DPSCS because of his SMI, self-injurious behavior, medication noncompliance, a pattern of inappropriate conduct secondary to his SMI, and numerous prior suicide attempts"; the failure to

obtain Robinson's heath records or to review his mental health history more closely; the failure to ensure he had a cellmate; and the failure to follow up within 24 hours of his release from suicide watch.  *Id.* ¶ 260.  Plaintiffs allege that the State and MHM found that understaffing, lack of communication and resources, and "inadequate remote access" to electronic records and the case management system contributed to these failures.  *Id.*  Plaintiffs allege the State and MHM's "findings are similar, if not identical, to [their] findings after the three suicides in 2015 and 2016 just prior to Mr. Robinson's death" and the "findings echo the findings and recommendations from the State, MHM, third-party auditors, and non-profit audits between 2007 and 2016."  *Id.* ¶¶ 261–62.

The MHM defendants argue that the amended complaint does not relate back because plaintiffs originally alleged only that policy failures, not customs, caused the constitutional violations.  This argument falls short for three reasons.

First, plaintiffs did allege in their original complaint that both policy failures and customs/practices caused Robinson's suffering and death.  *See* ECF 8, ¶¶ 84–85.  As discussed above, the initial allegations concerning failure to implement and enforce proper protocols and controls can reasonably be read as policy and custom allegations, which are amplified by plaintiffs' new allegations.

Second, even if plaintiffs alleged only policy failures in their original complaint, they were not limited to proving the § 1983 claim by relying solely on explicit policies, as opposed to practices and customs.  A pervasive practice or custom can amount to a "custom or usage with the force of law" (i.e., an unwritten policy) and is one way to prove a "policy or custom."  *See Lytle*, 326 F.3d at 471; *Lehan*, 2022 WL 703928, at *6.  Plaintiffs' possible methods of proof did not

change with the amendment.  Just as when they filed their original complaint, they had to prove the § 1983 claim by custom or policy (or both).

Third, even if the new allegations do not relate back to the allegations supporting the § 1983 claim, they relate back to the negligence allegations and, more specifically, the allegations of foreseeability.  Establishing foreseeability often involves evidence that the defendant was on notice of prior, similar incidents.  *See Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 897 (D. Md. 2015) (holding the collapse of a roof was reasonably foreseeable because the roof previously had failed); *Troxel v. Iguana Cantina, LLC*, 29 A.3d 1038, 1057–58 (Md. Ct. Spec. App. 2011) (holding harm foreseeable based on prior, similar incidents of rowdy crowds growing out of control in the absence of security measures).  The new allegations that MHM was on notice of prior, similar incidents that arguably resulted in other prisoner suicides supplement the allegations in the original complaint that MHM breached its duty to provide reasonable medical care to Robinson by failing to implement effective policies and that its breach was a foreseeable cause of Robinson's suffering and death.  *See* ECF 8, ¶¶ 67–70, 74.

The MHM defendants also argue the amendment does not relate back because plaintiffs allege in the amended complaint that the systemic failures occurred statewide, not just at ECI as initially alleged.  While it is true that plaintiffs initially alleged MHM's failures at ECI caused Robinson's death, they did allege in the original complaint that MHM provides mental health services statewide.  MHM's policies and customs at other state prisons—to the extent they are the same as or similar to those that allegedly caused Robinson's death—relate to whether MHM knew or should have known what care Robinson needed and whether it was deliberately indifferent to his serious medical needs.  *See Bost v. Wexford Health Sources, Inc.*, No. ELH-15-3278, 2020 WL 1890506, at *16 (D. Md. Apr. 15, 2020) (noting, in a *Monell* action against jail health care provider

based on failure to provide emergency medical care at one jail, relevant discovery included documents relating to defendant's provision of emergency care at other facilities).  Therefore, even though the expanded pattern and practice allegations now include MHM's statewide policies, they still share the same core facts alleged in the original complaint—that MHM and the State failed to implement or enforce effective policies, which caused Robinson's suffering and death.

Contrary to the MHM defendants' argument, this case is not like *Stidham v. Jackson*, No. 2:07cv00028, 2007 WL 2156155 (W.D. Va. July 26, 2007), where the proposed new claim was against a different actor.  There, the plaintiff brought a § 1983 action against a police officer who allegedly sexually assaulted her at her home; she did not assert a § 1983 action against the town that employed the officer.  *Id.* at *1.  The only allegations in her original complaint regarding the town were that the town was aware of the police officer's actions and failed to protect her, and the only claim against the town was based on *respondeat superior*.  *Id.*  The court denied the plaintiff leave to amend to add a § 1983 claim against the town because "there [were] absolutely no facts alleged in the [original] Complaint that could establish any cause of action against the Town based upon the theory" that the town maintained a pattern or practice that caused her injury.  *Id.*  Two of the cases discussed above reasoned similarly that there was no relation back because the new claims involved different actors.  *See English Boiler*, 1999 WL 89125, at *3; *Brightwell*, 2016 WL 4537766, at *5.

Here, unlike the defendants in *Stidham* and these other cases, plaintiffs asserted § 1983 and negligence claims against MHM in their original complaint, and in their amended complaint, they allege the same actor—MHM—caused Robinson's suffering and death and plaintiffs' loss and emotional pain and suffering.  While MHM's policies may have been carried out by different MHM employees, the relevant inquiry for the § 1983 claim is whether MHM's customs or

policies—whoever carried them out on MHM's behalf—resulted in the deprivation of Robinson's constitutional rights.  And the relevant inquiry for the negligence claims is whether MHM and the State, through their policies and/or practices, breached their duty of care to Robinson and whether it was foreseeable to them that the breach would cause his suffering and death.  These factual questions posed by the amended complaint are the same ones posed by the original complaint.

Finally, the MHM defendants argue the amendments do not relate back because they expand the time period of the alleged wrongful conduct from a narrow window in March 2016 to a span of years beginning in 2007 and concluding in 2016.  This, they urge, changes the § 1983 claim from "a cause of action based on the policies in effect as of March 2016" to a claim "based on a pattern and practice from 2007 through 2016 of purportedly failing to incorporate information learned regarding suicide prevention into their suicide prevention polices."  ECF 83-1, at 16. While it is true that plaintiffs expanded their allegations to include conduct dating back to 2007 (when MHM began providing mental health services to State prisoners), the alleged harm on which liability hinges—the ultimate wrong—remains Robinson's 2016 death, as in the original complaint.  MHM's earlier conduct may, for purposes of the § 1983 claim, establish a policy or custom showing MHM was deliberately indifferent to the risk of harm to Robinson.  Or, for purposes of the negligence claim, it may establish that Robinson's death was foreseeable. However, plaintiffs do not seek to recover—and due to the statute of limitations, cannot recover—damages for MHM's earlier conduct.

The Court concludes that the amended complaint relates back because the new factual allegations elaborate on the same core set of facts and ultimate wrong alleged in the original complaint: the systemic failures and insufficient policies of MHM and the State that caused

Robinson's suffering and death.  *See Grattan*, 710 F.2d at 163.  Because the amendments relate back, they are not time-barred by the statute of limitations, and amendment is not futile.

### C.  Lack of a Causal Relationship

The MHM defendants advance a new futility argument in their motion.  They argue that, regardless of whether the new allegations relate back, amendment would be futile because plaintiffs have not established a causal relationship between the new allegations and Robinson's death, and without that relationship, plaintiffs cannot prove a § 1983/*Monell* claim.  This argument is based on the contention that plaintiffs' liability expert Dr. Khalid El-Sayed did not opine during his deposition that MHM's policies and customs contributed to Robinson's death.  ECF 83-1, at 18–19.

If, in the amended complaint, plaintiffs do not allege a causal relationship between MHM's policies and customs and Robinson's death, amendment would indeed be futile.  But the Court does not look beyond the pleadings to answer this question.  Fed. R. Civ. P. 12(d).  Limiting its review to the amended complaint, the Court finds that plaintiffs allege causation.  For example, they allege "[t]he State and MHM identified numerous systemic and individual failures that caused or contributed to Mr. Robinson's untimely and preventable death.  These flaws mimic the data known to the State and MHM since 2007 regarding suicide risk for prisoners with [serious mental illness]." ECF 82, ¶ 260.  Whether plaintiffs can prove causation at trial is a question for another day, which the defendants may raise through a motion for summary judgment.  Ultimately, though, questions of causation are generally for the jury to decide.  *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 253 (4th Cir. 2015); *Pittway Corp. v. Collins*, 973 A.2d 771, 792 (Md. 2009).

Because plaintiffs allege causation and state a § 1983 claim against MHM, amendment was not futile.[9]

By granting plaintiffs' leave to amend, the Court did not commit error resulting in a manifest injustice.

### D.  Scope of Discovery

It is clear from the MHM defendants' filings and argument that a primary concern of theirs is the effect of the new allegations on the scope of discovery.  The new allegations, which lengthen the time period and expand the scope of the conduct from a single facility to statewide, do not entitle plaintiffs to comprehensive discovery on every allegation in the amended complaint.  Under Rule 26, the Court must limit discovery to nonprivileged information that is relevant to the claims and defenses in the case, proportionate to the needs of the case, and not unduly burdensome.  Fed. R. Civ. P. 26(b)(1) & (2)(C); *see Bost*, 2020 WL 1890506, at *14 (*Monell* discovery limited by Rule 26's requirements) (collecting cases).  The Fourth Circuit has cautioned district courts to manage discovery in *Monell* case to avoid fishing expeditions:

> As the Supreme Court stated in *Leatherman*, under the Federal Rules of Civil Procedure, primary reliance must be placed on discovery controls and summary judgment to ferret out before trial unmeritorious suits against municipalities.  No more so after *Leatherman* than before, should the district courts tolerate what will be for plaintiffs the temptation to seek unlimited discovery from municipal

---

[9] The MHM defendants ask the Court to treat their motion for reconsideration, in part, as a motion to dismiss because the amended complaint was filed before they filed for reconsideration.  ECF 83-1, at 1 n.2.  The futility analysis is essentially the same as the Rule 12(b)(6) analysis.  To survive a Rule 12(b)(6) motion, the "complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)); *see* Fed. R. Civ. P. 12(b)(6).  The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses."  *Ray*, 948 F.3d at 226 (quoting *Tobey*, 706 F.3d at 387).  Matters outside the pleadings, such as deposition testimony, are not properly before the Court on a Rule 12(b)(6) motion.  Fed. R. Civ. P. 12(d).  The Court accepts the well-pleaded allegations as true.  *See Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021).  To the extent the MHM defendants have moved to dismiss the § 1983 claim, the motion to dismiss is denied for the same reasons amendment is not futile.

> defendants in the mere hope of obtaining tidbits of information from which they
> can cobble together support for what were conclusory allegations of an
> impermissible municipal policy.  The district courts continue to have the wide
> discretion that they have traditionally enjoyed to deny indiscriminate, blanket
> requests for all files in a county's possession, which represent little more than
> fishing expeditions.

*Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994) (internal citations omitted).  These

principles will guide the remainder of discovery in this case.

## IV.    Certification

The MHM defendants request that the Court certify the January 13, 2022 Order for appeal.

"[C]ertification by a district court is appropriate if the district court's order 'involves a controlling

question of law as to which there is substantial ground for difference of opinion' and 'immediate

appeal . . . may materially advance the ultimate termination of the litigation.'"  *Kennedy v. St.*

*Joseph's Ministries, Inc.*, 657 F.3d 189, 195 (4th Cir. 2011) (quoting 28 U.S.C. § 1292(b)).

Certification is not appropriate here.  There is no controlling question of law as to which there is a

substantial ground for a difference of opinion.  The issue the MHM defendants raise is whether

the new allegations share a factual nexus with previous allegations such that they relate back and

are not barred by the statute of limitations.  That question does not turn on an undecided or

debatable question of law.  The law on relation back is not up for reasonable debate.  Nor would

immediate appeal materially advance the ultimate termination of the case.  Even if amendment of

the complaint were denied, the claims in the original complaint would remain.  Accordingly, this

Court declines to certify the issue for appeal.

## V.    Conclusion

The MHM defendants have failed to demonstrate a clear error of law resulted in manifest

injustice.  Their motion for reconsideration of this Court's January 13, 2022 Order or alternatively

to dismiss the amended complaint and their motion to certify the Order for appeal are denied.

Insofar as the MHM defendants ask the Court to strike the pleading, their motion is denied because they have not shown that the amended complaint is "redundant, immaterial, impertinent, or scandalous."  Fed. R. Civ. P. 12(f).


Date: <u>June 30, 2022</u>

                                           _____
                                           Deborah L. Boardman
                                           United States District Judge