**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**


**ARLINDA ROBINSON,** *et al.*                    *

     **Plaintiffs**                    *

    **v.**                    *       **Civil Case No. 8:19-cv-1025-DLB**

**DAVID PYTLEWSKI,** *et al.*                    *

    **Defendants**                    *


**MEMORANDUM OPINION**

  This is a case concerning the tragic death of a man incarcerated at one of Maryland's correctional facilities.  Pending before the Court are separate Motions to Compel Responses to Interrogatories and Requests for Production from Defendants, the State of Maryland and Dr. Howard Pinn (ECF No. 71), and Defendants MHM Services, Inc., a Virginia-based corporation that provides mental health services to incarcerated and detained individuals, and Dr. David Pytlewski (ECF No. 72).  On August 23, 2022, the Court heard Oral Argument on the pending Motions.  During the argument, Plaintiffs substantially narrowed the documents they are seeking at this time.  Nonetheless, Defendants have maintained that despite the amendment of the Complaint and Plaintiffs' narrowing, they oppose the production of any additional documents.  In light of such and for the reasons discussed below, Plaintiffs' Motion is GRANTED, in part, regarding the narrowed documents and interrogatory responses it currently seeks, and DENIED, without prejudice, regarding the remaining documents and interrogatory responses.

**BACKGROUND**

As alleged in the Amended Complaint, James Robinson, the decedent in this case, had long suffered from serious mental illness.  ECF No. 82, at 4.  Mr. Robinson first attempted suicide in 1992, and attempted suicide on multiple occasions thereafter.  *Id*.  From 2007 until his death in 2016, Mr. Robinson had a history of diagnosed bipolar disorder.  *Id*.

On October 2, 2015, Mr. Robinson was sentenced to imprisonment in the Maryland Department of Corrections (DOC) for one year and one day.  *Id*. at 3.  On the day that he arrived at the Howard County Detention Center, he was placed on suicide watch.  *Id*.  On October 5, 2015, the State transferred Mr. Robinson to the Jessup Correctional Institution (JCI).  *Id*.  Once there, psychiatric providers evaluated Mr. Robinson, diagnosed him with various psychotic disorders and prescribed him psychotropic medications.  *Id*. at 3-4.  On October 26, 2015, Mr. Robinson's treating psychiatrist noted that Mr. Robinson had not been taking his medication, was suffering from suicidal ideations, and thus, should be transferred to the Patuxent Institution for additional care.  *Id*. at 4.  On October 28, 2015, the State transferred Mr. Robinson to Patuxent.  *Id*.  The transfer did not substantially improve his situation.  On January 8, 2016, Mr. Robinson attempted suicide.  *Id*.

On February 2, 2016, the State transferred Mr. Robinson to the Eastern Correctional Institution (ECI), where he continued to refuse to take his medications.  *Id*.  Despite his well-known history of mental health troubles, Plaintiffs allege that Defendants took no immediate action to address them.  *Id*.  at 5.  Medical staff did not meet with Mr. Robinson until a week after he arrived.  *Id*.  On February 9, 2016, Mr. Robinson met with Dr. Pinn for an initial evaluation related to determining an appropriate housing classification.  *Id*.  Dr. Pinn recommended that Mr. Robinson be placed in general population if he took his medications.  *Id*.  On February 10, 2016,

Dr. Pytlewski met with Mr. Robinson. *Id*. Dr. Pytlewski, among other things, diagnosed Mr. Robinson with schizoaffective disorder, ordered bloodwork to be done on Mr. Robinson after two months had passed, and recommended a follow-up appointment in twelve weeks. *Id*. Dr. Pytlewski allegedly failed to complete a suicide screen. *Id*.

Between 12 P.M. EST on February 10th and 1:00 P.M. EST on February 11, 2016, Mr. Robinson visited the ECI medical department at least three separate times complaining of chest pains. *Id*. Each time, Mr. Robinson appeared to medical staff as disorganized; additionally, his speech was not coherent. *Id*. at 5-6. These behaviors concerned the medical staff at ECI such that on February 11, 2016, they asked Dr. Pinn to intervene. *Id*. at 6. After consulting with each other, Dr. Pinn and Dr. Pytlewski decided not to visit Mr. Robinson, concluding that Mr. Robinson was stable so long as he took his medication. *Id*. Dr. Pinn eventually met with Mr. Robinson on February 18, 2016. *Id*. At that time, Dr. Pinn noted that Mr. Robinson "remained difficult to focus and very scattered." *Id*.

Other than a visit for chest pain, Mr. Robinson did not see medical staff again until March 7, 2016, when he reported "I feel like taking a sheet and tying it around my neck and hanging it up." *Id*. In response, Dr. Pytlewski placed Mr. Robinson on administrative segregation suicide watch. *Id*. at 7. Dr. Pytlewski and Dr. Pinn met with Mr. Robinson again on March 8 and March 9, 2016. *Id*. Mr. Robinson spent the majority of both meetings laying on the floor, covered by a "suicide blanket."[1] *Id*. On March 10, 2016, the doctors reported that Mr. Robinson was compliant with his medication, had denied suicidal ideations, and could be transferred to a less restrictive tier of the facility if he could be placed in a cell with another incarcerated individual. *Id*. The doctors

---

[1] According to Plaintiffs' Complaint, "suicide blanket either refers to a straightjacket-like device, or a tear resistant blanket, both designed to reduce or eliminate the risk of suicide." ECF No. 82, at 7.

allegedly failed to: (a) perform a Suicide Assessment; (b) document the results of the Suicide Assessment in Mr. Robinson's electronic health record; (c) place appropriate property restrictions on Mr. Robinson, such as no bed linens; and (d) direct ECI correctional staff to monitor his medications and not place him in a cell by himself. *Id*. at 8-9.  The doctors had no further communication with Mr. Robinson nor took any further action regarding his condition. *Id*. at 9. That day, Mr. Robinson was transferred into a cell with another prisoner. *Id*.  Mr. Robinson refused his medication for the next four days. *Id*.

Plaintiffs' Amended Complaint describes the last day of Mr. Robinson's life as follows:

> On March 14, 2016, Mr. Robinson had a disciplinary hearing for the previously described "ticket," at which time seventy good conduct credits were revoked, adding two months and ten days to his mandatory release date. . . . On the evening of March 14, 2016, Mr. Robinson was found sitting at the end of his bunk with a sheet tied around his neck and tied to the bedframe.  He was pronounced dead at 11:19 p.m.

*Id*.

On March 4, 2019, Arlinda Robinson, Mr. Robinson's mother, and Diana Calderon, the mother of Mr. Robinson's two minor children, filed suit against 1) the State of Maryland and Dr. Pinn (hereinafter "State Defendants"); and 2) MHM Services and Dr. Pytlewski (hereinafter "Private Defendants").  ECF No. 2.  On the same day, the Defendants removed the case to federal court.  ECF No. 1.  On November 9, 2020, the parties agreed to a Protective Order limiting the disclosure of sensitive material produced in discovery.  ECF No. 52.  On May 20, 2021, Plaintiffs sought leave to file an amended complaint.  ECF No. 63.  As with Plaintiffs' original Complaint, in Count 1, Plaintiffs alleged that each of the Defendants' negligence caused Mr. Robinson's death. ECF No. 63-5, at 49.  In Count 2, Plaintiffs alleged that each of the Defendants wrongfully caused the death of Mr. Robinson. *Id*. at 51-52.  In Count 3, Plaintiffs alleged that Dr. Pytkewski, Dr.

Pinn, and MHM, through their deliberate indifference, caused the death of Mr. Robinson in violation of the Eighth and Fourteenth Amendments to the United States Constitution.  *Id*. at 53. Importantly, the Amended Complaint specifically states the following regarding MHM's responsibility for Mr. Robinson's death under this count:

> As described herein, since at least 2007, Defendant MHM demonstrated a pattern and practice of deliberate indifference to the known medical needs of Maryland prisoners with SMI, including Mr. Robinson, by failing to ensure that proper controls and/or protocols were in place to monitor prisoners with severe mental illness, to monitor prisoners with suicidal ideations and tendencies, to monitor prisoners with prescriptions for psychotropic medications, to respond to prisoners' acute conditions and severe medical symptoms, or to provide prisoners with appropriate treatment for their medical conditions while housed at ECI.

*Id*. at 54.  According to the Amended Complaint, not only the doctors', but MHM's failures directly impacted Mr. Robinson: "As a result of MHM's failures to implement and/or enforce appropriate controls and protocols for the care of prisoners at ECI, especially those with SMI, Mr. Robinson needlessly suffered and ultimately died."  *Id*. at 55.  Finally, in Count IV, Plaintiffs allege that each of the Defendants' failures also violated Articles 16 and 25 of the Maryland Declaration of Rights.[2] *Id*.  Defendants opposed the amendment of the Complaint because it "sought to add 201 paragraphs of . . . new factual allegations. . . .  The majority of allegations concern the nine years prior to the Decedent's 2016 death and [allegedly had] nothing to do" with the death of Mr. Robinson.  ECF No. 64, at 4; *see* ECF No. 65, at 9-10 ("by Plaintiff's own admission, a completely new operative set of facts which, in alleging entirely different harm on the part of Defendant MHM, cannot relate

---

[2] Plaintiffs also sought to add two counts under the Americans with Disabilities Act, ECF No. 63-5, at 56-59, which the Court disallowed Plaintiffs from including in the final Amended Complaint. ECF No. 81.  The counts are not the basis for the disputed requests in the pending Motions.

back to the date of filing of the original complaint."). As this Court has described, in the new paragraphs:

> Plaintiffs cite deficiencies in MHM's delivery of mental health services that were identified in the years leading up to Robinson's death and were still uncorrected when Robinson died. Plaintiffs allege that MHM knew of and failed to cure its programmatic insufficiencies. . . . Plaintiffs allege the State and MHM's findings are similar, if not identical, to [their] findings after the three suicides in 2015 and 2016 just prior to Mr. Robinson's death and the findings echo the findings and recommendations from the State, MHM, third-party auditors, and non-profit audits between 2007 and 2016.

ECF No. 101, at 23-24. Notably, Defendants' complaints focused on the additional factual allegations, as opposed to the deliberate indifference count as alleged in the Amended Complaint. *See* ECF No. 64, at 15 ("the portion of Plaintiffs' Motion for Leave to Amend the Complaint to add new facts that form the basis of the allegations in the Amended Complaint related to Defendant State should be denied as futile.") (internal quotation marks omitted); ECF No. 65, at 10 ("For these reasons, Plaintiffs' Motion for Leave to Amend the Complaint to add new factual allegations related to Defendants MHM and Dr. Pytlewski should be denied.").

On October 21, 2021, Plaintiffs filed separate Motions to Compel Responses to Interrogatories and Requests for Production against State Defendants and Private Defendants. ECF Nos. 71 and 72. The Motions raised complaints regarding a number of Defendants' discovery responses. In response, each of the Defendants generally raised concerns regarding the relevancy as well as the burden of producing the totality of the information Plaintiffs had requested in the interrogatories and requests for production, largely emphasizing that many of the documents requested were beyond the scope of the original Complaint. *See e.g.* ECF No. 74 at 7 ("this Request is not related to any party's claims or defenses and any purported need for such information is not proportional to the needs of this case (and thus also overly broad and unduly

burdensome).  Simply put, this case pertains to a single incident and the mental health care at issue only spans two months."); ECF No. 75, at 9 ("Plaintiffs' insistence that pursuit of the Complaint on behalf of Decedent requires discovery of eleven years of information concerning institutions other than ECI, inmates other than the Decedent, and incidents other than the Decedent's tragic suicide is simply at odds with the scope of the Complaint and principles of relevance.").  Private Defendants also asserted the peer review privilege in response to several requested categories of documents.  *See e.g.* ECF No. 74, at 5.  Private Defendants, in a supplemental filing, also added the "self-evaluative privilege" to their bases of opposition.  ECF No. 87, at 6.  Meanwhile, State Defendants indicated that they had not withheld any documents on the basis of privilege.  ECF No. 75, at 6.  In a supplemental filing in February 2022, the State revised its position, stating that it was, in fact, asserting the peer review privilege regarding any quality assurance reviews requested.  ECF No. 88, at 6.

On January 12, 2022, the Court held a hearing on Plaintiffs' Motion for Leave to File an Amended Complaint.  ECF No. 80.  The next day the Court granted the Motion allowing the inclusion of the disputed new paragraphs providing additional detail regarding Plaintiffs' claims that the Defendants' pattern and practices constituted deliberate indifference and, thereby, caused the death of Mr. Robinson.  ECF No. 81.  On January 24, 2022, Private Defendants moved for reconsideration of the Court's decision on Plaintiffs' Motion for Leave to Amend.  ECF No. 83.  Private Defendants complained that in the Amended Complaint, "Plaintiffs contend[ed], for the first time, that Defendant MHM has engaged in a pattern and practice of indifference toward Maryland prisoners with serious mental illness dating back to 2007. . ."  ECF No. 83-1, at 4.  Private Defendants argued that these new factual allegations should have been excluded because: 1) the information supporting such claims was available to Plaintiffs when they initially filed suit;

and 2) Plaintiffs could not "casually connect the pattern and practice allegations to Mr. Robinson's death, thereby making such claims futile." *Id*. at 7.  In support of the second argument, Private Defendants specifically argued that

> [i]t is true that in their original (third) Complaint, Plaintiffs alleged that Mr. Robinson's death was the result of Defendant MHM's failure to ensure proper protocols were in place to monitor prisoners with severe mental illness.  However, these allegations refer only to protocols as they existed in March of 2016, not Defendant MHM's supposed long track record of maintaining inadequate protocols going back to 2007.

*Id.* at 12 (internal quotation marks omitted); *see also id.* at 83-1, at 11 ("There can be no "factual nexus" between allegations that address *different time periods*, different actors, and different conduct.") (emphasis added); *id.* at 13 ("there is clearly no factual nexus between both sets of allegations as they concern different actors, different time periods, and most importantly different conduct."); *id.* at 17 ("Here, the amendments are <u>different</u> in <u>time</u> (by a whopping nine years) (emphasis in original)).

In denying Defendants' Motion for Reconsideration, the Court explicitly rejected Defendants' argument, reaffirming that the new factual allegations did not fundamentally change the nature of Plaintiffs' claim for deliberate indifference:

> A reasonable interpretation of the[] allegations [in Plaintiffs' initial complaint] is that MHM did not have effective policies for treating people with severe mental illness at ECI and that MHM engaged in a practice of failing to implement or enforce effective policies at the prison, despite its knowledge of the ineffectiveness of its policies and customs.  These prison-wide failures allegedly constituted a breach of MHM's duty of care and were a foreseeable cause of Robinson's suffering and death.  While the allegations in the original complaint were far from robust, as plaintiffs concede, they made clear when discovery opened that MHM faced negligence and Monell claims based on the ineffectiveness of its policies and customs.

ECF No. 101, at 23.  Alternatively, the Court found that even if Plaintiffs alleged only policy failures in their original Complaint, they were not limited to proving the § 1983 claim by relying solely on explicit policies, as opposed to practices and customs.  *Id*. at 24.

On June 30, 2022, this case was referred to my chambers for "all discovery and related scheduling matters."  ECF No. 103.  On July 16, 2022, I asked the parties to submit separate status reports as to whether their positions regarding the documents remained unchanged given the Court's rulings on Private Defendants' Motion for Reconsideration.  ECF No. 104.  The parties filed separate statements in which Defendants indicated that despite the Court's rulings, their position on the discovery disputes remained unchanged.  *See* ECF No. 105, at 1 ("The MHM Defendants continue to object to Plaintiffs' ongoing outstanding discovery requests as well outside the scope of the factual allegations in Plaintiffs' Amended Complaint."); ECF No. 106, at 2 ("The State Defendants continue to object to the lack of proportionality between the "core of operative facts" alleged in the amended complaint . . . and the breadth and burdensomeness of many of Plaintiffs' discovery requests, which seek documents and information well beyond those facts.").  In their separate filing, Plaintiffs stated that they maintained their request that the Court hold Oral Argument on their pending Motions before ruling.  ECF No. 107.

On August 23, 2022, I heard arguments on Plaintiffs' pending Motions to Compel, ECF No. 113, during which, Plaintiffs substantially narrowed their requests.  Although Plaintiffs' initial Motion to Compel sought responses to several interrogatories and requests for production, in some cases dating back to 2005, Plaintiffs currently seek: 1) Mortality Reviews, Corrective Action Plans, and Quality Assurance Reviews related to every suicide at ECI since 2012; 2) the "suicide database" – an excel sheet containing basic information (name of prisoner, date of incident, and type of self-harm) regarding every reported self-harm incident in Maryland correctional facilities;

and 3) all documents related to MHM's compensation from the State of Maryland and/or its agencies for healthcare services that MHM renders in Maryland prisons.

During the hearing, Defendants conceded that the first two categories of documents were in the possession of the State and information related to the third category could be in the possession of either Defendant.  Regarding the Mortality Reviews, Corrective Action Plans, and Quality Assurance Reviews, Defendants objected to the production of the documents because they alleged the peer review privilege protected them and any documents before Mr. Robinson's 2015 incarceration were supposedly irrelevant to the case.  Regarding the suicide database, Defendants argued that they had produced a "summary" of the database, which was allegedly identical to the database, other than that the names of each prisoner had been redacted.  Finally, Defendants objected to the production of any documents related to the State's compensation of MHM, on the grounds that such documents could never be relevant to the case.

Plaintiffs additionally identified two more matters currently in dispute: 1) the timing for production of materials which each of Defendants' experts have relied on; and 2) whether Defendants would produce a list of individuals that they may be relying on if the case advances to trial.  During the hearing, Defendants agreed to produce expert reliance materials a reasonable period of time before the deposition of each expert; and to produce the requested list of potential trial witnesses, if Defendants would not be bound to call each of the witnesses identified.  Given the parties' temporary resolution of these last two matters, I do not address them in this Opinion.

**STANDARD OF REVIEW**

Federal Rule of Civil Procedure 37(a) "authorizes the basic motion for enforcing discovery obligations."  CHARLES ALAN WRIGHT, ET AL., 8B FED. PRAC. & PROC. CIV. § 2285 (3d ed. 1998).  Where a party fails to answer a request for production of documents or an interrogatory,

10

the Rule allows the opposing party to move for an order compelling an answer.  Fed. R. Civ. P. 37(a)(3)(B)(iii)-(iv).  The moving party must certify in the motion that it has conferred, or attempted to confer, in good faith with opposing counsel in an effort to obtain the desired material without court involvement.  Fed. R. Civ. P. 37(a)(1).  District courts enjoy substantial discretion in managing discovery, including granting or denying motions to compel.  *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).

## ANALYSIS

As noted above, the current dispute between the parties centers on three categories of documents: 1) the Mortality Reviews, the Quality Assurance Reviews, and the Corrective Actions Plans created after every suicide at ECI from 2012 to 2016; 2) the suicide database; and 3) all documents related to compensation MHM received from the state.  I address each dispute in turn below.

### I.    State Defendants Must Produce the Requested Mortality Reviews, the Quality Assurance Reviews, and the Corrective Actions Plans.

In Plaintiffs' initial Request for Production No. 11, Plaintiffs sought "any and all documents and/or correspondence between the State of Maryland/DPSCS/ECI and MHM Services, Inc. that relate to suicide prevention, suicide prevention or mitigation, or suicide monitoring, between January 1, 2012 and December 31, 2016."  ECF No. 71-1 at 7-8; *see also id.* at 11 (discussing Request for Production No. 29 for "[a]ny and all documents relating to quality assurance reviews performed in connection with any suicide deaths at ECI between January 1, 2005 and March 31, 2016."); *id.* at 13 (discussing Request for Production No. 30: "All reports/findings of the Chief Psychologist/Lead at ECI in connection with the administrative reviews of suicide deaths at ECI, between January 1, 2005 and March 31, 2016.").  As narrowed, pursuant to these requests, Plaintiffs request the production of Mortality Reviews, Quality

Assurance Reviews and Corrective Action Plans for every suicide that occurred at ECI between 2012 and 2016.  Defendants contest the production of these documents because: 1) they are allegedly protected by Maryland's peer review privilege and a common law self-evaluative privilege; and 2) allegedly any documents prior to Mr. Robinson's incarceration are not relevant to the case.  I reject both of these arguments.

### A.  The Documents Are Not Protected from Disclosure by the Peer Review or Self-Evaluative Privileges.

As an initial matter, Private Defendants have asserted the peer review privilege and the self-evaluative privilege, but as stated at Oral Argument, the documents requested are in the possession of the State, which did not initially assert either privilege.  Nonetheless, out of an abundance of caution, I address the merits of the privilege arguments below.

Because this case concerns the violation of federal law, the Maryland medical peer review privilege is not controlling.  *Price v. Howard County General Hosp.*, 950 F.Supp.141, 143 (D. Md. 1996) ("The present suit raises a federal claim of conspiracy in restraint of trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and, therefore, the Maryland medical peer review privilege is not controlling.").  Accordingly, whether this Court recognizes the privilege depends on "balance[ing] the need for discovery of the information from the medical peer review committee files against the policies behind the state privilege."  *Id*.  The burden to establish that otherwise relevant discovery is privileged is on the party asserting the privilege.  *See In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term. 1991*, 33 F.3d 342, 352 (4th Cir. 1994).

This court has, on multiple occasions, rejected the application of the privilege where the need for it was outweighed by the interest in bringing to light whether the allegations in a lawsuit are true.  For example, in the context of a lawsuit alleging violations of the Sherman Antitrust Act, this court stated:

> Faced with the issue of the discovery of information protected by a
> state medical peer review privilege from a party, as opposed to a
> non-party, in the context of an antitrust action, several courts have
> held that the federal interests in ascertaining the truth through an
> examination of all the available facts and the driving force behind
> the federal antitrust laws – free competition [–] outweigh the
> policies underlying the state privilege.

*Price*, 950 F.Supp. at 143 (internal quotation marks omitted); *see also Virmani v. Novant Health*,
259 F.3d 284, 289 (4th Cir. 2001) ("The interest in facilitating the eradication of discrimination by
providing perhaps the only evidence that can establish its occurrence outweighs the interest in
promoting candor in the medical peer review process.").

The Fourth Circuit has likewise emphasized, in rejecting the privilege, that the interest in
the privilege is minimized where release of the documents would not only potentially benefit the
plaintiff in the present case, but the public at large. *Id.* at 291 (refusing to recognize the privilege
in a discrimination case because, among other things, "if a plaintiff succeeds in a discrimination
case, he advances important public interests in addition to his personal interests."); *see also
Memorial Hosp. v. Shadur*, 664 F.2d 1058, 1062 (7th Cir. 1981) (refusing to recognize a privilege
for medical disciplinary proceedings in an antitrust case and observing that if the plaintiff was
successful in proving his claim, he would "vindicate not only his own right to practice medicine .
. . , but also the strong public interest in open and fair competition which is embodied in the
Sherman Act under which the case arises").

Each of these concerns are applicable in the correctional context where public oversight is
particularly important, given the limited ability of incarcerated individuals to advocate on their
own behalf, communicate with the public, and draw attention to the deprivation of constitutional
rights they may suffer. *See Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005) ("Whereas
in the ordinary hospital it may be that the first object of all involved in patient care is the welfare

13

of the patient, in the prison context the safety and efficiency of the prison may operate as goals affecting the care offered.  In these circumstances, it is peculiarly important that the public have access to the assessment by peers of the care provided. Given the demands for public accountability, which seem likely to guarantee that such reviews take place whether they are privileged or not, we are not convinced by the County's argument that such reviews will cease unless kept confidential by a federal peer review privilege."); *see also Dunn v. Dunn*, 163 F.Supp.3d 1196, 1207 (M.D. Ala. 2016) ("The importance of public scrutiny of medical and mental-health care is greater in the prison and jail contexts than in an ordinary medical-malpractice case, to which MHM unconvincingly analogizes this case.").  The sad reality is that public attention is only drawn to medical conditions in correctional facilities when events such as those at the center of this case occur.  *See* Benjamin Weiser, *Kalief Browder's Suicide Brought Changes to Rikers. Now It Has Led to a $3 Million Settlement*, N.Y. TIMES, Jan. 24, 2019 ("New York City has agreed to pay $3.3 million to settle a lawsuit on behalf of the estate of Kalief Browder, the young Bronx man whose detention on Rikers Island became a symbol of the breakdown in criminal justice in New York and fueled the drive to ban solitary confinement for youths in the city's jails."). The medical peer review privilege assumes that if medical peer review committees are left to themselves the lack of transparency will provide space for them to self-correct. *Virmani*, 259 F.3d at 290 ("the decision to accord privileged status to peer review materials, in at least some states, appears to have been based on the policy decision that the interest in promoting candor among medical personnel outweighs the interest in providing access to evidence in medical malpractice actions.").  What has been seen in the correctional context in multiple states, given the little other meaningful oversight, is that the lack of transparency, instead of allowing space for self-correction, provides a sheath to let the same mistakes repeat themselves over time.  *See e.g. Brown v. Plata*,

14

563 U.S. 493, 503 (2011) ("Prisoners in California with serious mental illness do not receive minimal, adequate care.  Because of a shortage of treatment beds, suicidal inmates may be held for prolonged periods in telephone-booth-sized cages without toilets."); *Depriest as Next Friend of CB v. Epps*, NO. 3:10-cv-00663-CWR-FKB, 2012 WL 13208701, at *3 (S.D. Miss. Mar. 26, 2012) ("The sum of these actions and inactions by WGYCF, WGDA, the State, the Department of Corrections, GEO and Health Assurance, L.L.C., paints a picture of such horror as should be unrealized anywhere in the civilized world.  Court intervention, as proposed by the parties, is undoubtedly necessary.").  Accordingly, the ascertainment of truth in such cases is just as important, if not more than it is in the antitrust context, and will benefit not only just the Plaintiffs, but potentially all seriously mentally ill individuals at ECI who may be subject to the policies and practices Plaintiffs allege caused the death of Mr. Robinson.

Unsurprisingly then, this Court has explicitly considered and rejected the precise argument Defendants now advance in this specific context.  In *Bost v. Wexford Health Services*, No. ELH-15-3278, 2017 WL 3084953 (D. Md. June 9, 2017), the plaintiff alleged that a woman detained at the Baltimore County Detention Center died as a result of a medical provider's and its employees' failure to adequately respond to signs that the woman was experiencing a stroke.  *Id*., *1.  Like Plaintiffs here, the plaintiff in *Bost* brought a "systemic challenge to the quality of medical health care within a prison facility under 42 U.S.C. § 1983 – specifically, allegations that the medical care was either so poor or so non-existent that it constituted a policy of cruel and unusual punishment in violation of Decedent's Eighth Amendment rights."  *Id*., *2.  To prove its case, plaintiff in *Bost* sought Internal Monthly Incident Review Reports and Mortality Logs.  *Id*., *3.  Like Defendants here, the defendants in *Bost* asserted a medical peer review privilege, which the Court rejected:

> The impact of disclosure of Wexford's Mortality Logs and Internal Monthly Incident Reports on the future accuracy of Wexford's peer review evaluations is likely to be minimal in comparison to the probative value of such evidence to the pending litigation. . . . In addition and as Plaintiff correctly points out, the Supreme Court has yet to recognize a federal medical peer review privilege and there are no circuit court cases recognizing such a privilege. Every circuit court that has addressed the issue of a federal medical peer review privilege has flatly rejected the assertion.

*Id.*, *4. The decision of the Court in *Bost* was not unique. "[A]lmost every district court that has addressed the issue of peer review privilege in the specific context of section 1983 litigation brought on behalf of prisoners has rejected the assertion." *Id.* (citing *Lewis v. County of Henry*, No. 1:05-cv-0270-JDT-TAB, 2006 WL 1843336, at *2 (S.D. Ind. June 29, 2006) (rejecting medical peer review privilege in section 1983 medical malpractice claim arising out of detention at Clark County Nevada's Detention Center); *Weiss v. County of Chester*, 231 F.R.D. 202, 207 (E.D. Pa. 2005); *Leon v. County of San Diego*, 202 F.R.D. 631, 637 (S.D. Ca. 2001) (rejecting peer review privilege in the context of prisoner death litigation under section 1983); *Jenkins v. DeKalb Cty., Georgia*, 242 F.R.D. 652, 661 (N.D. Ga. 2007) (finding that recognition of federal common law medical peer review privilege was not warranted); *but see Hadix v. Caruso*, No. 4:92-CV-110, 2006 WL 2925270, at *2 (W.D. Mich. Oct. 6, 2006) (finding existence of medical peer review privilege in Eighth Amendment prisoner civil rights claim)).

When the privilege has been found to outweigh the interest in disclosure, it has been in one of two specific contexts: a medical malpractice or a defamation action. *Virmani*, 259 F.3d at 290 (describing the specific circumstances in which federal courts have recognized the privilege). Although Plaintiffs in this case allege medical malpractice, Plaintiffs conceded at Oral Argument that any Quality Assurance Reviews, Corrective Action Plans, or Mortality Reviews produced could and would only be used in support of the deliberate indifference claim.

16

The cases which Defendants rely on are distinguishable and, in some cases, have been distinguished by other subsequent decisions from this Court. For example, Defendants rely on *Brem v. DeCarlo, Lyon, Hearn & Pazourek, P.A.*, 162 F.R.D. 94, 97 (D. Md. 1995). As this Court explained in *Price*, "the Maryland medical peer review privilege has been extended to protect information in an action involving federal race and sex discrimination and state defamation claims. In reaching [its] decision, [the court in *Brem*] noted that discovery was sought from a non-party and the information was available from sources independent of the peer review process." *Price*, 950 F.Supp. at 144. In this case, Plaintiffs seek the information from one of the sets of Defendants in the case and neither set of Defendants has identified any other source of information analyzing the causes of deaths of other individuals like Mr. Robinson. In fact, Defendants have, up to this point, refused to produce information relating to the deaths of individuals other than Mr. Robinson, arguing that it is irrelevant.[3]

Private Defendants also cite *Dicks v. Ottey*, No. 1:14-cv-01463-ACH (D. Md. Jun. 15, 2016), which also arose in the correctional context. ECF No. 74, at 6. The decision in *Dicks* has limited application in this case for several reasons. First, the decision pre-dates this Court's decision in *Bost*. Second, although *Dicks* involved a claim that an incarcerated person was not properly treated for skin lesions, plaintiff in *Dicks* sought information concerning an entirely different type of medical condition. ECF No. 74-4, at 2. Accordingly, the information requested had limited probative value. Here, Plaintiffs do not seek information regarding deaths of prisoners who died in manners different from Mr. Robinson, but only request documents related to other

---

[3] In their February 2022 status report, State Defendants offered, as a compromise, the production of Suicide Meeting Minutes, in place of the Quality Assurance Reviews. ECF No. 88, at 6-7. However, State Defendants, during Oral Argument, clarified that the specific terms of the compromise did not represent a change in the State's position and should not be considered by the Court when making its ultimate decision as to the Motion to Compel.

suicides.  Third, the decision in *Dicks* relies heavily on *Brem* which concerned the distinct context of a request to a non-party for information which was otherwise available.  *Id*. at 2-3.

Finally, Defendants reference *Tyndall v. Berlin Fire Company*, No. ELH–13–2496, 2014 WL 7363830 (Dec. 23, 2014).  Like *Dicks*, the decision predates *Bost*, and relied chiefly on the Court's decision in *Brem*.  *Id.*, *2.  Additionally, unlike *Bost*, it occurred in the entirely distinct context of a plaintiff seeking information regarding medical treatment he received after a motor vehicle collision.  *Id.*, *1.

In sum, given this Court's decision in *Bost*, this court's multiple decisions limiting the application of the peer review privilege, the fact that Plaintiffs do not seek such documents to use in support of a medical malpractice or defamation claim, the overriding interest in disclosure given that the events in question occurred in the correctional context, and the fact that disclosure would potentially benefit not only Plaintiffs, but the public at large, I conclude that the peer review privilege does not apply to the documents requested in this case.

Likewise, for the same reasons, I also decline to apply the self-evaluative privilege to the documents requested.  As an initial matter, it bears emphasis that "the Fourth Circuit Court of Appeals has not expressly recognized the privilege, let alone cited it with approval and applied it to prevent the disclosure of documents.  Moreover, courts seem reluctant to extend the privilege beyond the circumstances . . . in a medical malpractice suit[.]"  *Williams v. Corelogic Rental Solutions*, No. PX 16-58, 2016 WL 6277675, at *6 (D. Md. Oct. 26, 2016).  Nonetheless, whether documents allegedly protected by the self-evaluative privilege must be produced – like the peer review privilege – depends on a balancing of the interests supporting disclosure and the interests supporting confidentiality.  *Id*.  Private Defendants attempt to distinguish the tests by arguing that to defeat the self-evaluative privilege, the requesting party must show "exceptional need."  ECF

No. 87, at 7.  Their briefing overstates this Court's acceptance of this test, as well as the privilege, as a whole.  In *In re Grand Jury Proceedings*, 861 F.Supp. 386 (D. Md 1994), on which Private Defendants primarily rely, this Court detailed the scope of the privilege and its limited recognition, stating:

> Although the privilege has been occasionally recognized and applied in instances involving private litigants, courts have appeared reluctant to enforce even a qualified 'self-evaluative' privilege.  The Fourth Circuit apparently has yet to apply the privilege to prevent disclosure of documents during discovery, but, on at least one occasion, has upheld a trial court's refusal to require production of confidential faculty member evaluations in a discrimination suit . . . [although] without mention of the self-critical analysis privilege.

*Id.* at 388 (internal citations and quotation marks omitted).  The court then closed by noting that "*[t]hose courts which have recognized the privilege* generally have required that a plaintiff seeking to overcome the privilege demonstrate an 'exceptional need' for the materials protected by the privilege."  *Id.* (emphasis added).  Ultimately, the Court not only refused to adopt the test that Private Defendants cite as controlling, but "granted the government's motion to compel and . . . declined to apply the self-evaluative privilege to the documents in th[e] matter."  *Id.* at 391.  In fact, "outside of the D.C. Circuit, those courts that have recognized the privilege often have not applied the exceptional necessity requirement.  These courts have applied a balancing test."  *Wei v. Bodner*, 127 F.R.D. 91, 101 (D.N.J. 1989).  Accordingly, for the same reasons, that the peer review privilege does not apply, the self-evaluative privilege does not protect the requested documents from disclosure.

### B.  Documents From 2012 to 2016 Are Relevant and Not Unduly Burdensome to Produce.

Defendants' arguments contesting the relevance of and burden from producing such documents are similarly unpersuasive.  Defendants' arguments that discovery should be limited to

only those time periods during which Mr. Robinson was incarcerated misunderstand the nature of Plaintiffs' pattern and practice claim and merely regurgitate the arguments the Court rejected in denying Defendants' Motion to Reconsider discussed above.

### 1. The Information Sought is Relevant.

Although Rule 26 does not define relevancy, it has been "broadly construed to encompass any possibility that the information sought may be relevant to the claim or defense of any party." *O'Malley v. Trader Joes East, Inc.*, No. RDB-19-3273, 2020 WL 6118841, at *3 (D. Md. Oct. 15, 2020) (internal citations and quotation marks omitted); *see also Carr v. Double T Diner*, 272 F.R.D. 431, 433 (D. Md. 2010). "Knowledge of the claims advanced by Plaintiff and the evidentiary proffers made in the course of various court proceedings informs the Court's judgment as to what information can be considered relevant to Plaintiff's case." *Enovative Technologies, LLC v. Leor*, NO. JKB-14-3956, 2015 WL 13021884, at *1 (D. Md. Aug. 7, 2015). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1).

As noted, in Plaintiffs' Amended Complaint, Plaintiffs allege that Mr. Robinson's death was not only the result of the actions of Dr. Pinn and Dr. Pytlewski, but a pattern and practice of unconstitutional conduct by Defendant MHM. In support, they allege over 200 paragraphs of factual allegations related to failures to prevent the suicides of incarcerated persons dating back to 2007. In a pattern and practice case, a plaintiff must "must present evidence from [which] the fact-finder can reasonably conclude that" an unconstitutional practice was the "standard operating procedure – the regular rather than the unusual practice." *Equal Rights Center v. Equity Residential*, Case. No.: AMD–06–1060, 2008 WL 11363366, at *2 (D. Md. June 6, 2008) (citing *United States v. Balistrieri*, 981 F.2d 916, 929 (7th Cir. 1992)). "Proof of isolated or sporadic acts

of discrimination" are not sufficient to establish a "pattern or practice" of insufficient medical care. *Id*. Accordingly, the information which Plaintiffs now seek – concerning the causes of other suicides dating back to 2012 – is central to proving one of their claims and, thus, clearly relevant.

Defendants' argument that these materials are irrelevant to this case because they do not concern the death of Mr. Robinson are repetitive of the arguments that they raised in opposition to the Plaintiffs' Motion for Leave to Amend the Complaint. Then, as they do now, Defendants argued that any allegations predating Mr. Robinson's arrival at the facility or concerning the deaths of other prisoners were not a part of this case. The Court rejected these arguments. These arguments are even less persuasive now than they were previously. As stated, whether materials sought in discovery are relevant is guided by the scope of the allegations in the Complaint. Given that the Court has already determined that the scope of the case is not limited to only the time-period during which Mr. Robinson was incarcerated, it would be inconsistent to conclude that anything beyond is irrelevant. Although the Court acknowledged in its Order denying Defendants' Motion for Reconsideration, as Defendants emphasize, that a party may not be entitled to "comprehensive discovery on every allegation in the Amended Complaint," ECF No. 101, at 29, whether such discovery is proper is a question of burden, not relevance. Furthermore, as discussed below, as narrowed, Plaintiffs' current requests are distinguishable from the indiscriminate blanket requests to which the Court's decision referred. *Id.* at 29-30 (quoting *Jordan by Jordan v. Jackson*, 15 F.3d 333, 340 (4th Cir. 1994)).

## 2. Production of the Documents Would Not be Unduly Burdensome.

Although the information may be relevant, that does not, by itself, determine whether it must be produced. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (noting that "discovery, like all matters of procedure, has ultimate and necessary boundaries") (internal citation

and quotation marks omitted). In addition to being relevant, discovery "must be measured against the yardstick of proportionality." *Fish v. Air and Liquid Systems Corporation*, No. GLR-16-496, 2017 WL 697663, at *3 (D. Md. Feb. 21, 2017) (internal citation and quotation marks omitted); *see Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 355 (D. Md. 2012). Under Rule 26, whether a discovery request is proportional is determined by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

As Defendants have conceded, the documents that Plaintiffs have requested related to the suicides of other individuals at ECI are in the State's possession. Accordingly, the disclosure of the documents requested would not pose any burden on Private Defendants. The only remaining question, therefore, is whether the disclosure would pose an undue burden on the State.

Plaintiffs have narrowed the scope of their requests, largely responding to the State's concerns. For example, in response to RFP No. 11, Defendants expressed concern regarding the failure to identify specific employees from whom communications were sought. ECF No. 71-2, at 2. Plaintiffs, in turn, have abandoned their requests for electronic mail, focusing instead on specific types of suicide reviews. Likewise, in response to RFPs Nos. 29 and 30, Defendants noted that the requests were burdensome because they covered eleven years and could be located in hard copy in various locations. *Id*. at 4-5; ECF No. 88, at 6-7. Plaintiffs, in turn, have reduced their request to a period covering four years immediately preceding Mr. Robinson's death, explaining that in 2012, the State instituted new policies related to self-harm which were in place at the time of Mr. Robinson's death. Additionally, although the State raised concern related to the burden of

producing documents regarding prisoners who committed suicide at other facilities, Plaintiffs for the time being have abandoned their requests for such documents. *See* ECF No. 75, at 9 (protesting "Plaintiffs' insistence that pursuit of the Complaint on behalf of Decedent requires discovery of eleven years of information concerning institutions other than ECI . . ."). Finally, Plaintiffs initially sought several other categories of documents, well beyond what they currently seek, which for the time being they have decided to forego. Given Plaintiffs' efforts to narrow the facilities, the time period, and the types of documents they seek, I find that production of the requested suicide related documents would not be unduly burdensome.

I recognize Defendants' concerns regarding the confidential nature of the information in the requested records. However, the Court has previously approved a Protective Order, stipulated to by the parties. Any suicide related information produced in response may be designated as confidential subject to the Order. Neither of the Defendants' briefings provide an explanation as to why the Protective Order is insufficient, aside from the discussed arguments related to the peer review privilege and the relevance of these documents. *See* 45 C.F.R. § 164.512(e)(1) (allowing disclosure of protected health information pursuant to a qualified protective order).

## II.      State Defendants Shall Produce the Entirety of the Suicide Database Dating Back to 2008.

Plaintiffs' initial Request for Production No. 20 asked for "all Suicide Notification Forms . . . from January 1, 2008 through December 31, 2016." ECF No. 71-1, at 10. In their Motion to Compel the State, among other documents, Plaintiffs request the "suicide database" – an excel sheet which tracks all self-harm incidents at all Maryland correctional facilities. *Id*. at 11. State Defendant, in its Opposition, responded to this request by only stating that Plaintiffs have failed to provide specific reasons for requiring specific medical records for medically vulnerable prisoners at ECI over a eight year period. ECF No. 75, at 15-16. State Defendants argument misses the

mark for two reasons.  First, the argument is repetitive of the argument rejected by the Court that any information related to suicides at other facilities or beyond the time period that Mr. Robinson was incarcerated is irrelevant to the case.  Because Plaintiffs allege that the death of Mr. Robinson was the result of a pattern and practice of unconstitutional conduct system-wide, data relating to prisoners other than Mr. Robinson, and dating back before his incarceration, is relevant.  Second, as made clear during Oral Argument, Plaintiffs do not seek specific medical records for each of these individual prisoners – which, given the contours of this case, would create serious questions of undue burden even if the records are relevant – but only the database which tracks the name of the prisoner, the place of their incarceration, the date of incident and the type of self-harm.

In their February 2022 Status Report, State Defendants argued that the burden would not arise from the production of the document itself, but the redaction of information that would identify prisoners therein.  ECF No. 88, at 5.  This argument also fails for two reasons.  First, it is unclear whether any burden from redacting two columns – one including names and the other including identification numbers – in an excel sheet, at once, would pose an "undue" burden, given the direct relevance of the information therein to Plaintiffs' claims.  Second, as noted above, such redactions are not necessary as the information may be produced subject to the Protective Order entered in this case.

For the aforementioned reasons, I cannot accept the State's argument that the production of an excel sheet – whether dating back two years or eight years – would constitute an undue burden.

During Oral Argument, the State proffered that it had in fact already produced the entirety of the suicide database, but had only retracted the names of the individual prisoners who were the subject of each entry.  Plaintiffs contested this representation.  To resolve the dispute, I asked

Plaintiffs to file under seal a copy of the document produced by the State.  Upon review of the document, I agree with Plaintiffs' position.  The document the State has produced is not a copy of the entirety of the database with only the names of the prisoners redacted, but rather a list of Maryland correctional facilities in one column and a list of months running across the top.  More troubling, all information in every column of the database is redacted, making it impossible to determine, presumably, the number of self-harm incidents that occurred at each facility during each month.  Accordingly, the document is neither what the State argued that it had produced; nor does it appear that only the names of prisoners have been redacted.  Furthermore, the document in its current redacted form provides none of the substantive information Plaintiffs have requested and which is relevant to whether Plaintiffs may advance a pattern and practice claim.  As such, Defendants' prior production does not obviate the need for the production of the database in its entirety.

### III. Private Defendants Must Produce a Limited Set of Documents Related to Financial Compensation.

Plaintiffs' Request for the Production No. 29 to Private Defendants asks for "[a]ll documents describing and/or related to your compensation from the State of Maryland and/or its agencies for healthcare services that you render in Maryland prisons."  ECF No. 72-1, at 8-9. Private Defendants provided a boilerplate response.  *See id.* at 9 ("Defendant objects to this Request because it seeks discovery that is not related to any party's claims or defenses and because it is overly broad and unduly burdensome. Defendant further objects to the extent that this Request seeks the production of confidential documents."); *D.J.'s Diamond Imports, LLC v. Brown*, No. WMN–11–2027, 2013 WL 1345082, at *7 (D. Md. 2013) (concluding an objection was insufficiently particular where it stated: "This request is overly broad and irrelevant for purposes of the remaining limited claim in this litigation. Information contained in the federal [and state]

tax returns is irrelevant and not likely to lead to any relevant or admissible evidence."). In Private Defendants' Opposition to Plaintiffs' Motion to Compel, Private Defendants reiterated that the materials requested were irrelevant to the case.[4]  In their Reply, Plaintiffs clarified

> these documents could show that MHM had a financial incentive to minimize certain mental healthcare services (i.e. capitated financing model – a flat fee earning ceiling for the relevant time regardless of how many prisoners MHM treated, or what type of treatment it provided). These documents could also show that MHM implemented cost-cutting policies leading to understaffing, insufficient programming, delays or outright failures to provide necessary mental healthcare, and/or failures to oversee and monitor MHM employees and processes.

ECF No. 78, at 6.  Neither of the Private Defendants' subsequent filings responded to Plaintiffs' asserted basis for the relevance of these documents.  *See* ECF No. 87, at 9 (repeating, without further clarification, that "compensation the MHM Defendants receive is not related to any party's claims or defenses and any purported need for such information is not proportional to the needs of this case (and, thus, is also overly broad and unduly burdensome)."). During Oral Argument, Plaintiffs provided further support for production of the materials requested, namely that they had elicited deposition testimony that on at least one occasion State Defendants had financially sanctioned Private Defendants for failure to comply with their obligations to the State under their

---

[4] Although Private Defendants also asserted that the production of documents would be unduly burdensome, their brief was clear any burden argument was dependent on a finding that the documents were irrelevant.  *See* ECF No. 74, at 6 ("The compensation the MHM Defendants receive is not related to any party's claims or defenses and any purported need for such information is not proportional to the needs of this case (and thus also overly broad and unduly burdensome)."). Accordingly, I do not address any burden related to the production of the documents, separate and apart from finding that a subset of the documents requested are relevant to the case.  Furthermore, even if Private Defendants had properly raised and substantiated any burden objection unrelated to the relevance of the documents, as discussed above, I have substantially narrowed their request for documents under this provision, eliminating any concerns regarding the burden of producing the requested documents pursuant to this request.

contract.  Neither Private Defendants nor the State were able to provide any response other than stating that they were unaware as to whether any such happenings had occurred.

To the extent that Private Defendants have been found by the State, between 2012 and 2016, to have violated the terms of its contract with the State or otherwise have been financially sanctioned for: failures related to the treatment of prisoners with serious mental illnesses; the failure to comply with procedures and protocols related to the prevention of suicide or self-harm by incarcerated persons; or for actions which contribute to an increase in self-harm or suicide incidents such information is directly relevant to Plaintiffs' pattern and practice claim.  Such documents are direct evidence of not only the existence of patterns and practices which Plaintiffs allege, but also Private Defendants' knowledge of the patterns and practices, which is directly relevant to whether Private Defendants have been deliberately indifferent.  *See Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) ("The Court held that deliberate indifference in this context lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law.") (internal citations omitted).  Accordingly, while I, at the current time, do not order the production of all documents requested under RFP No. 29, Private Defendants shall produce all documents, from 2012 to 2016, related to financial penalties Private Defendants incurred from the State of Maryland for failures related to the treatment of prisoners with serious mental illnesses; the failure to comply with procedures and protocols related to the prevention of suicide or self-harm by incarcerated persons; or for actions which contribute to an increase in self-harm or suicide incidents.

## CONCLUSION

For the reasons stated above, State Defendants shall produce:

- In response to <u>Requests for Production Nos. 11, 29, and 30</u>: all Mortality Reviews, Quality Assurance Reviews and Corrective Action Plans related to every suicide that occurred at ECI between 2012 and 2016; and

- In response to <u>Request for Production No. 20:</u> the entirety of the suicide database dating back to 2008.

For the reasons stated above, Private Defendants shall produce:

- In response to <u>Request for Production No. 29:</u> all documents, from 2012 to 2016, documenting the amount of and/or the reasons for financial penalties Private Defendants incurred from the State of Maryland for failures related to the treatment of prisoners with serious mental illnesses; the failure to comply with procedures and protocols related to the prevention of suicide or self-harm by incarcerated persons; or for actions which contribute to an increase in self-harm or suicide incidents.

The remaining requests and interrogatories in the Motions to Compel are DENIED, without prejudice.  Plaintiffs may re-raise these requests supported by a specific showing of the need related to each category of documents or interrogatory response.

So ordered.


Date: September 7, 2022                    _____/s/_____
                                                           Ajmel A. Quereshi
                                                           U.S. Magistrate Judge